**SHELL OIL COMPANY,**
**Plaintiff–Appellant,**

v.

**AMOCO CORPORATION,**
**Defendant–Appellee.**

**No. 91–1364.**

United States Court of Appeals, Federal Circuit.

July 28, 1992.

Albert M.T. Finch, Jr., of Shell Oil Co., Houston, Tex., argued for plaintiff-appellant. Of counsel was Keith M. Tackett.

Roland N. Smoot, of Lyon & Lyon, Los Angeles, Cal., argued for defendant-appellee.

Before ARCHER, Circuit Judge, SMITH, Senior Circuit Judge, and LOURIE, Circuit Judge.

LOURIE, Circuit Judge.

Shell Oil Company appeals the judgment of the United States District Court for the Southern District of Texas, No. H–90–3949 (May 16, 1991), dismissing its action under the Declaratory Judgment Act, 28 U.S.C. § 2201 (1988), against Amoco Corporation, for lack of a justiciable controversy. We affirm.

## BACKGROUND

Amoco owns U.S. Patent 4,540,679 entitled "Magnesium Hydrocarbyl Carbonate

Supports," which claims a composition, and a method of preparing the composition, comprising a transition metal component and a magnesium hydrocarbyl carbonate support. Shell manufactures catalysts for making polyolefins such as polypropylene, including the SHAC® 206 catalyst, which is commercially produced by reacting titanium tetrachloride (a transition metal component) with spray-dried particles of magnesium hydrocarbyl carbonate. Shell began commercial production of its SHAC® 206 catalyst in the United States in May 1990.

On March 14, 1990, before beginning production, Shell initiated a meeting between two patent attorneys for Shell, Douglas Baldwin and Dean Vance, and one Amoco attorney, Wallace Oliver, regarding its commercialization of the catalysts. At that meeting, Baldwin stated that Shell would shortly begin manufacturing the catalyst, that it had strong views that it did not infringe the '679 patent, but that it also wanted to resolve any potential uncertainty, either by an agreement or in court. Vance stated, *inter alia*, that Shell's product did not infringe the '679 patent because it had no magnesium hydrocarbyl carbonate support and the '679 patent was invalid. Shell's attorneys left with Amoco a copy of Shell's briefing note on its new catalyst and a proposed agreement, in which Amoco would agree not to assert the '679 patent against Shell's catalysts produced from spray-dried magnesium hydrocarbyl carbonate and Shell would pay $100,000 for a paid-up license.

In response to the March meeting, Oliver wrote to Shell on April 4, 1990, stating that the proposed royalty was inadequate. Amoco counter-offered to license its entire patent for a royalty of 1% of polypropylene polymer net sales. On April 9, 1990, Shell responded by letter, stating that it did not want a general, unlimited license because it believed the patent was invalid and not infringed. Shell then offered to pay Amoco $10.00 per pound of catalyst sold, with a $500,000 cap, in which case royalty pay-

ments would be limited to sales of the first 50,000 pounds.

On May 4, 1990, Amoco responded to Shell's April 9 offer and rejected the concept of a cap. Its letter stated in relevant part:

It is our understanding form [sic] our previous discussion that *the catalyst falling within the Amoco patent* would be used in one plant in Europe and one non-Unipol plant in the U.S.

(Emphasis added). Shell contends that this was Amoco's first charge of infringement, arguing that the language "falling within" constituted a threat of infringement.[1] Amoco also requested a meeting with Shell to discuss a new licensing proposal.

During April and May, Oliver and Vance had numerous telephone conversations. In one of those conversations, Oliver allegedly stated that Shell's catalyst would infringe even if it had no magnesium hydrocarbyl carbonate in it, as long as it was made from magnesium hydrocarbyl carbonate. According to Shell, this constituted Amoco's second charge of infringement.

On May 18, 1990, representatives for Shell and Amoco met again. At that meeting, Oliver stated that he was not going to debate the validity or infringement of the patent, but indicated that he would not accept Shell's position. Shell stated that it had three options: (1) obtain a license from Amoco, (2) litigate by filing a declaratory judgment action, or (3) find alternative catalysts. Then Shell offered to pay a stated running royalty with a $750,000 cap for its proposed catalyst and double that rate for any other infringing catalyst. Amoco rejected the offer, stating that Shell would never make an "other" licensed catalyst if Amoco accepted such a low royalty for the proposed catalyst. Amoco countered with a "no cap" royalty, which Shell rejected. Amoco then suggested that the parties consider a technology exchange, involving Shell's catalyst technology in return for a license under the '679 patent. Subsequently, the parties explored this option.

1. Shell conceded at oral argument that this was the only express charge of infringement made by Amoco.

In a November 1990 telephone conversation, Oliver told Vance that Amoco was no longer interested in a technology exchange, and suggested that their respective vice-presidents meet to discuss the catalyst matter. Vance stated that it appeared that the parties were at an impasse, but Oliver indicated that he felt progress could be made, and they agreed to meet on December 20, 1990. They did so without any resolution.

On December 21, Shell received a letter summarizing the December 20 meeting. In this letter, Amoco referred to the discussions as "regarding Shell's operations under Amoco's U.S. Patent." Amoco also wrote that "although Shell disagrees that Amoco's patent covers Shell's operations, it recognizes that the claims of such patent may be read to do so." Shell considers these comments to be the third charge of infringement by Amoco since they reflect that Amoco did not accept Shell's position; they also indicate that the '679 patent covered Shell's operations. Additionally, Amoco wrote that Oliver proposed a limited license wherein

> Shell would obtain a right to manufacture its specific catalyst but not a general right to manufacture any other catalyst which may be *covered under the patent.*

(Emphasis added). This, according to Shell, was the fourth charge of infringement by Amoco.

Before the meeting ended, offers were again made and rejected. Shell indicated that the parties were at an impasse and that litigation appeared likely. Oliver questioned whether Shell could file a declaratory judgment action since Shell was not manufacturing its catalyst. Vance responded that Shell was manufacturing the catalyst and asked, "I assume you will enforce your patent?" A representative of

Amoco replied, "Yes," and the meeting ended.

After the December 20 meeting, Shell filed a declaratory judgment action for a declaration of non-infringement and invalidity of the '679 patent, based on its asserted apprehension that Amoco would eventually file an infringement action. Amoco filed a motion to dismiss under Fed.R.Civ.P. 12(b)(1), asserting the absence of an actual case or controversy. The district court granted Amoco's motion, stating that

> [t]he Court's review of the submissions of the parties and the exhibits attached to those submissions does not reveal that Amoco ever caused Shell to reasonably apprehend a patent infringement suit related to Shell's production, use, and sale of the polypropylene catalyst at issue.

(Citations omitted).

## DISCUSSION

 Under the Declaratory Judgment Act, 28 U.S.C. § 2201 (1988),

> [i]n a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

An actual controversy must be present before a declaratory judgment action is ripe for adjudication. *See Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937). To constitute an actual controversy, the plaintiff has the burden of establishing by a preponderance of the evidence, *inter alia,* that it has a reasonable apprehension that it will be sued.[2] *See Jervis B. Webb Co. v. Southern Sys., Inc.,* 742 F.2d 1388, 1398, 222 USPQ

---

**2.** The test for determining whether an actual controversy exists in a declaratory judgment suit in a patent case is two-pronged.

First, the defendant's conduct must have created on the part of the plaintiff a reasonable apprehension that the defendant will initiate suit if the plaintiff continues the allegedly infringing activity. Second, the plaintiff must actually have either produced the device or have prepared to produce that device.

*Goodyear Tire & Rubber Co. v. Releasomers Inc.,* 824 F.2d 953, 955, 3 USPQ2d 1310, 1311 (Fed. Cir.1987) (citations omitted). Neither party disputes that the second prong has been satisfied since Shell began commercial production of its catalyst in May 1990. Therefore, we focus only on the first prong of the test.

943, 949 (Fed.Cir.1984). The test is an objective one, which in this case focuses on whether Amoco's conduct rose to a level sufficient to indicate an intent to enforce its patent. *See Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736, 6 USPQ2d 1685, 1689 (Fed.Cir.1988). We must look for any express charges of infringement, and if none, then to the "totality of the circumstances." *Id.* Shell had the burden of establishing that it reasonably believed that Amoco had an intent to initiate a patent infringement suit. On appeal, we must determine whether the trial court erred in finding that Shell failed to meet this burden.

 The general course of activities between the parties is not disputed.[3] The legal effect of the parties' conduct, in particular, whether it was sufficient to create an actual controversy, is a question of law which we review *de novo. Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d at 735, 6 USPQ2d at 1688. However, the "district court's view of the legal effect of the fact pattern before it is not to be lightly disregarded."[4] *Id.*

Shell argues that the district court erred as a matter of law by requiring the presence of corresponding or related litigation as evidence of a reasonable apprehension of infringement and in seeking evidence of Amoco's intent. However, it is not apparent to this court that the district court required such evidence. We agree with Shell that an actual controversy may arise from the conduct of the parties alone; an express charge of infringement is not required. *See Goodyear,* 824 F.2d at 956, 3 USPQ2d at 1312 ("we cannot read the Declaratory Judgment Act so narrowly as to require that a party actually be confronted with an *express* threat of litigation"). "When the defendant's conduct, including its statements, falls short of an express charge, one must consider the 'totality of

the circumstances.' " *Arrowhead,* 846 F.2d at 736, 6 USPQ2d at 1689. Related litigation may be evidence of a reasonable apprehension, but such evidence is not required.

According to Shell, Amoco actually made an express charge of infringement against Shell in its May 4, 1990 letter, which stated that Shell's operations "fall[ ] within" the claims of the '679 patent. Amoco replies that its statement in the May 4, 1990 letter merely reflected Amoco's understanding of Shell's position and Shell's reasons for approaching Amoco for a license. Amoco claims that its position is further supported by a similar letter of April 4, 1990, in which Amoco stated "[w]e understand that Shell intends to use a supported polypropylene catalyst which you believe may fall within the claims of the Amoco patent."

 We agree with Amoco that a statement that Shell's activities "fall within" Amoco's claims in the context of the parties' licensing negotiations can hardly be considered an express charge of infringement. Aside from the fact that it was provoked by Shell, it merely constitutes a statement of Amoco's position in negotiations relative to Shell's activities. It alone did not create a reasonable apprehension of suit.

Since Amoco's conduct falls short of an express charge of infringement, we must look to the totality of the circumstances to determine if an actual controversy exists. Shell asserts that Amoco indirectly charged infringement in a conversation in April or May 1990, when Amoco stated that the '679 patent claims do not require the presence of carbonate in the catalyst support. Shell alleges further charges of infringement in Amoco's December 21 letter to Shell summarizing the events of the December 20 meeting, in which Amoco stated that negotiations continued regarding Shell's opera-

---

3. Although a few specific details are disputed and the district court did not make underlying factual findings in its determination of no actual controversy, the general course of proceedings between the parties is clear. For the purpose of our determination, any disputed details have been construed in favor of Shell.

4. Amoco argues that regional circuit law applies. We disagree. The reasonable apprehension of a threat of patent infringement "clearly implicates" the patent law; the law of this circuit therefore applies. *See Goodyear,* 824 F.2d at 954 n. 3, 3 USPQ2d at 1311 n. 3.

tions "under" the '679 patent, and in which Amoco offered a limited license, not a general license for any other catalyst "which may be covered under the patent." Finally, Shell notes that when Shell specifically asked Amoco if it intended to enforce its patent, Amoco responded "Yes." Amoco replies that Shell had no reasonable apprehension because these alleged "charges" of infringement were merely "jawboning" which typically occurs in licensing negotiations. We agree with Amoco.

We must look at these events in the context in which the discussions arose. Amoco took no action against Shell; it made no assertive contact concerning the patent; it issued no threats. Shell, in an exercise of prudent good business citizenship, approached Amoco, stating that it intended to embark on a course of conduct, recognizing, but disagreeing, that Amoco's patent might be considered to dominate its work. Rather than wait to be caught in a possibly infringing posture, it identified its proposed activity to Amoco and sought either confirmation of its views or a license. Such conduct is praiseworthy.

Amoco, on the other hand, then defended its patent. In doing so, it should not be considered to have threatened Shell with suit. Shell clearly stated that it considered the '679 patent to be invalid and not infringed. The statements by Amoco which Shell alleges were charges of infringement were simply Amoco's responses to Shell's initiatives. Amoco's use of language to indicate that Shell's activities "fall within," are "covered by," and are "operations under" Amoco's patent fall short of alleging infringement. The language closest to constituting a threat occurred when Shell asked if Amoco intended to enforce its patent, and Amoco answered "yes." However, under the circumstances, that answer was reflexive and obligatory. To have answered "no" would have potentially given Shell free reign to infringe Amoco's patent. If Amoco wanted to continue to negotiate a license with Shell, its response was necessary.

It is possible that, even after the conversations reached an impasse, Amoco might never have sued, either because the validity of its patent was doubtful or its infringement argument was too weak. In fact, if Shell had never approached Amoco, Amoco might never have considered any action against Shell. That was Amoco's right, either not to sue or not be provoked into suit by another party's initiated discussions. The Declaratory Judgment Act was intended to protect threatened parties, not to drag a non-threatening patentee into court. We will not encourage litigation by finding a threat to sue only because a non-threatening party, when approached by a possible infringer, asserted its best arguments in discussions. Amoco's statements to Shell, in the context in which they arose, were not threats to sue. They were responses, characterizations, and arguments arising from discussions Shell initiated.

We do not hold that in every instance in which a potential infringer approaches a patentee that an actual controversy cannot arise. Whether an actual controversy exists depends on either an express charge of infringement or, if none, the totality of the circumstances. A reasonable apprehension of an intent to initiate an infringement suit may be found from statements made during licensing negotiations, since the possibility of litigation may objectively appear to compel acceptance of offered terms. This is not the case here; Amoco's conduct did not rise to the level of a threat of an infringement suit.

We have considered Shell's other arguments and find them to be without merit.

## CONCLUSION

Shell did not meet its burden of proving that an actual controversy existed between Amoco and Shell. Accordingly, the district court's order dismissing Shell's complaint for lack of subject matter jurisdiction is

AFFIRMED.