**CYGNUS THERAPEUTICS SYSTEMS, Plaintiff–Appellant,**

v.

**ALZA CORPORATION, Defendant–Appellee.**

No. 95–1367.

United States Court of Appeals, Federal Circuit.

Aug. 6, 1996.

Lynn H. Pasahow, McCutchen, Doyle, Brown & Enersen, San Francisco, California, argued, for plaintiff-appellant. With her on the brief, was Beth H. Parker. Of counsel was Carolyn L. Reid.

Herbert H. Mintz, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., Washington, D.C., argued, for defendant-appellee. With him on the brief, was Barbara Clarke McCurdy. Also on the brief were Robert T. Haslam and Sarah W. Anderson, Heller, Ehrman, White & McAuliffe, Palo Alto, California.

Before CLEVENGER, SCHALL, and BRYSON, Circuit Judges.

SCHALL, Circuit Judge.

Cygnus Therapeutics Systems ("Cygnus") appeals from the May 25, 1995 judgment of the United States District Court for the Northern District of California in favor of ALZA Corporation ("ALZA") in *Cygnus Therapeutic Systems v. ALZA Corporation,* Docket No. C–94–0174 EFL, 1995 WL 312093. Judgment was entered following the district court's Order of May 17, 1995, granting summary judgment for ALZA on Cygnus's claim against ALZA under the antitrust laws and dismissing for lack of jurisdiction, because of the absence of an actual controversy, Cygnus's claim against ALZA for a declaratory judgment under the patent laws. Cygnus had brought an action against ALZA stating two claims for relief. In its first claim, Cygnus sought damages and injunctive relief on the ground that ALZA was using United States Patent No. 4,588,580 ("the '580 patent") to engage in attempted and actual illegal monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2. In its second claim, Cygnus sought a declaratory judgment of invalidity and unenforceability with respect to the '580 patent, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. We affirm.

## BACKGROUND

### I.

The pertinent facts are not in dispute. Both Cygnus and ALZA are engaged in the development and production of transdermal delivery systems for the pharmaceutical industry. Such systems deliver drugs through the skin at a controlled rate. Typically, a transdermal system is composed of a flexible membrane and a reservoir containing the drug in question. The system is sometimes referred to as a "patch." When the membrane is applied to the skin, the drug is transferred from the system into the skin where it is absorbed into the bloodstream to produce its systemic analgesic effect.

ALZA is the assignee of the '580 patent, which was issued on May 13, 1986. The patent teaches the use of a transdermal delivery system for fentanyl, an analgesic used for pain management in chronic cancer patients. Cygnus has been developing its own transdermal fentanyl patch since 1986. In 1987, both ALZA and Cygnus requested reexamination of the '580 patent by the United States Patent and Trademark Office ("PTO"), pursuant to 35 U.S.C. §§ 302–07. On January 3, 1989, the PTO issued a reexamination certificate for the '580 patent.

Claim 1 of the reexamined patent is representative of the invention:

1. A process for inducing and maintaining analgesia in a human being by the transdermal administration of a material selected from the group consisting of fentanyl and its analgesically effective derivatives which comprises transdermally administering to said human being through an area of intact skin, a skin permeable form of said material at an analgesically effective rate and continuing the administration of said material to said human being at said rate for an extended period of time at least sufficient to induce analgesia.

On January 6, 1989, just after the reexamination certificate had issued, Dr. Gary Cleary, Chairman of Cygnus, had a luncheon meeting with Dr. Jane E. Shaw, the President and Chief Operating Officer of ALZA. According to Dr. Cleary, Dr. Shaw brought up the subject of the Cygnus fentanyl patch and suggested that, in view of the '580 patent, it made no sense for Cygnus to continue investing in its fentanyl patch project. Dr. Cleary stated that he hoped Cygnus and ALZA could find a way to work together on a fentanyl delivery system. Dr. Shaw explained that this was not possible in view of ALZA's existing relationship with Janssen Pharmaceutica, a subsidiary of Johnson & Johnson ("Janssen"). In his notes of the meeting, Dr. Cleary stated that, with respect to fentanyl, ALZA "[w]ant[s] to maintain dialogue with us." Dr. Cleary also wrote in his notes that Dr. Shaw indicated that

[p]erhaps we could get together to discuss [fentanyl] at a later time.... [Shaw] says that they don't want to be in litigation nor should we want to go through the resource crunch that will happen if it does go to court. She didn't want us to spend a lot of time and $$ only to get into some rocky legal hassles [sic] later.

In February of 1989, Dr. Shaw sent a letter to Robert Lippert, Director of Licensing and Medical Development for the Anaquest Division of BOC, Inc. ("Anaquest"). Pursuant to an agreement with Cygnus, Anaquest was collaborating with Cygnus in connection with the development of a transder-

mal delivery system for fentanyl. It also was engaged in discussions with ALZA relating to fentanyl. Dr. Shaw informed Mr. Lippert that the '580 patent had survived reexamination and referred to the fact that ALZA and Anaquest had not been able to reach an agreement relating to the marketing of a fentanyl patch. Dr. Shaw wrote:

[Y]ou may not be aware of the outcome of the reexamination proceedings that had been instituted by Cygnus Corporation against ALZA's U.S. patent relating to the transdermal fentanyl dosage form.

I thought you would be interested to know that the proceedings have been resolved in a manner which we consider to be quite favorable....

Although we were unable to reach an agreement relating to the marketing of the transdermal fentanyl product and ALZA has entered into an exclusive arrangement with another company, I want to assure you that I remain optimistic that there will be an opportunity for us to collaborate on some other projects.

The next event that is pertinent to the dispute occurred in January of 1991 at the Hambrecht and Quist Healthcare Conference. Dr. Cleary described the conference as "a highly visible private investment conference geared toward bringing together CEOs of bioscience companies and institutional investors." While giving a presentation at the conference, Martin Gerstel, Chief Executive Officer of ALZA, stated, in response to a question from the audience:

The question is that I mentioned a number of companies are developing products that are covered by our patents, what is our policy.

They won't market the products because we're not going to give them licenses and the patents are valid. In many cases, they've already been challenged and have been upheld. And our policy will be that we have spent a great deal of money developing this technology and we have a very strong proprietary position.

The collaborative relationship that existed between Cygnus and Anaquest continued after the PTO issued its reexamination certifi-

cate for the '580 patent. Cygnus looked to Anaquest "and/or others" as sources of "funds and other assistance ... for the final testing of the Cygnus transdermal fentanyl system." In October of 1992, Paul G. Thomas, Vice President for Marketing and Business Development at Anaquest, wrote Dr. Shaw. The letter read as follows:

As you may be aware, Anaquest's transdermal fentanyl patch product is currently being reviewed by the FDA for an indication in the treatment of postoperative pain. Following a diligent and complete clinical development program and discussions with the FDA, Anaquest is confident in its abilities to demonstrate that our fentanyl patch is a safe and effective treatment for acute postoperative pain.

The transdermal fentanyl patch product has been designed by Cygnus as a 24 hour duration patch with attributes that make it particularly useful in the postoperative setting. The patch differs from the current Alza [sic] patch with respect to its design, indication, clinical use and targeted market.

In light of the complementary nature of the two fentanyl patch products, i.e., each designed and indicated for different uses, I am interested in arranging a meeting with you to discuss potential areas for commercial cooperation that may benefit both Alza [sic] and Anaquest. With your concurrence, I would like to schedule a meeting sometime over the next few weeks to discuss these areas more specifically. I will call you later this week and attempt to arrange a time for such a meeting.

Following Mr. Thomas's letter to Dr. Shaw, there were various discussions between ALZA and Anaquest. In this setting, Dr. Shaw told Mr. Thomas that ALZA's already-existing distribution arrangement for its fentanyl product with Janssen had to be taken into account in any discussions with Anaquest.

Eventually, after getting no "definitive response" from Dr. Shaw with regard to Mr. Thomas's efforts to continue licensing discussions with ALZA, Anaquest wrote ALZA on February 4, and May 6, 1993, repeating its request for such discussions. Enclosed with the May 6 letter was a draft complaint against ALZA seeking declaratory relief of patent invalidity and unenforceability with respect to the '580 patent. In the letter, Martin M. McGlynn, the president of Anaquest, stated that, "[i]n the event we cannot resolve matters through discussions, we feel we have no option but to commence legal action to remove [the '580] patent as an obstacle to our going forward with our plans."

On May 12, 1993, Edward L. Mandell, ALZA's vice president for legal matters, responded to Mr. McGlynn's letter. In his letter, Mr. Mandell referred to ALZA's "existing relationship with Johnson & Johnson that would be affected by ALZA's granting a license to Anaquest under the subject patent." Mr. Mandell wrote that ALZA was "evaluating the economic consequences of this matter" and was "presently discussing these issues" with Johnson & Johnson. Mr. Mandell concluded that "[u]ntil our discussions with Johnson & Johnson are completed, I believe that any meeting with Anaquest would be premature." In the fall of 1993, Anaquest terminated its fentanyl development project with Cygnus, and Cygnus was unable to find another development partner.

## II.

On January 18, 1994, Cygnus brought this action against ALZA. As noted above, Cygnus's complaint asserted two claims for relief. First, Cygnus sought damages and injunctive relief on the ground that ALZA was engaging in attempted and actual illegal monopolization of the relevant markets and submarkets for transdermal delivery systems for fentanyl, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

In its second claim for relief, Cygnus requested a declaratory judgment of patent invalidity and unenforceability on the grounds that

ALZA has shown a willingness to enforce its patent rights, both in past litigation concerning other patents and in its statements to industry, Cygnus, Anaquest and other potential allies and distributors concerning the '580 patent. Because of the

uncertainty of obligation that ALZA's statements have caused, Cygnus'[s] business has been harmed, in particular by the effect that the '580 patent has had on Cygnus'[s] ability to maintain and attract business partners to bring the Cygnus fentanyl patch to market. Further, Cygnus initiated and engaged in unsuccessful negotiations for a commercially reasonable license from ALZA for the fentanyl patch. Thus, Cygnus has a reasonable apprehension that ALZA will threaten or bring an infringement action should Cygnus continue with development of its fentanyl patch.

Cygnus filed an amended complaint on May 25, 1994, elaborating upon its description of the events that caused Cygnus to believe ALZA intended to enforce its patent. In due course, ALZA moved (i) pursuant to Fed.R.Civ.P. 12(b)(1) to dismiss Cygnus's declaratory relief claim for lack of jurisdiction and (ii) for partial summary judgment on the antitrust claim pursuant to Fed.R.Civ.P. 56(c). The district court took the case under submission based upon the parties'. filings, which included affidavits, declarations, and various other documents.

As noted above, on May 25, 1995, the district court dismissed Cygnus's declaratory judgment claim. It did so after concluding that there was no actual controversy that would give the court jurisdiction over the action. At the same time, the court granted summary judgment in favor of ALZA on Cygnus's antitrust claim.

## DISCUSSION

### I.

We have exclusive jurisdiction over an appeal from a final judgment where the jurisdiction of the district court was based in whole or in part on 28 U.S.C. § 1338. 28 U.S.C. § 1295(a)(1) (1994). In this case, the jurisdiction of the district court was based in part on section 1338 because Cygnus sought a declaratory judgment of invalidity and unenforceability with respect to the '580 patent. That fact gives us jurisdiction over Cygnus's appeal concerning both its declaratory judgment and antitrust claims. *See Panduit Corp. v. All States Plastic Mfg. Co., Inc.,* 744

F.2d 1564, 1573, 223 USPQ 465, 470 (Fed.Cir. 1984). We have pendent jurisdiction over matters, such as antitrust claims, attached to a patent claim pursuant to 28 U.S.C. §§ 1295(a) and 1338. *Id.* at 1572 n. 9, 223 USPQ at 470 n. 9; *see also Indium Corp. of America v. Semi–Alloys, Inc.,* 781 F.2d 879, 228 USPQ 845 (Fed.Cir.1985), *cert. denied,* 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986) (affirming district court's dismissal of plaintiff's antitrust claim on standing grounds and dismissal of declaratory judgment claims for lack of jurisdiction for failure to prove an actual controversy).

### II.

We address first the issue of whether the district court erred in dismissing Cygnus's declaratory judgment claim. The Declaratory Judgment Act provides in pertinent part as follows:

> In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201 (1994).

Before a district court may render a declaratory judgment, there must be an actual controversy over which the court may exercise jurisdiction. *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239–40, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937) (Declaratory Judgment Act "is operative only in respect to controversies which are such in the constitutional sense"). "In general, the presence of an 'actual controversy' within the meaning of the statute depends on 'whether the facts alleged, under all the circumstances, show that there is a substantial. controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *EMC Corp. v. Norand Corp.,* 89 F.3d 807, 810, 39 U.S.P.Q.2d 1451, 1453 (Fed. Cir.1996), (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)). Even if there is an actual controversy, "the district

court is not required to exercise declaratory judgment jurisdiction, but has discretion to decline that jurisdiction." *Id.* at 810, 39 U.S.P.Q.2d at 1453 (citing *Public Serv. Comm'n v. Wycoff Co.,* 344 U.S. 237, 241, 73 S.Ct. 236, 239, 97 L.Ed. 291 (1952)). As this court summarized in *Spectronics Corp. v. H.B. Fuller Co.,* 940 F.2d 631, 634, 19 USPQ2d 1545, 1547 (Fed.Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991): "When there is no actual controversy, the court has no discretion to decide the case. When there is an actual controversy and thus jurisdiction, the exercise of that jurisdiction is discretionary." Whether an actual controversy exists is a question of law that we review *de novo. B.P. Chems., Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 978, 28 USPQ2d 1124, 1126 (Fed.Cir.1993).

■ In a patent context, an actual controversy exists if there is

(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.

*Id.* at 978, 28 USPQ2d at 1126.

■ The district court dismissed Cygnus's declaratory judgment claim because it concluded that Cygnus had failed to establish the first prong of an actual controversy. Before the district court, Cygnus had the burden of proving, by a preponderance of the evidence, that its apprehension of being sued was reasonable. *Shell Oil Co. v. Amoco Corp.,* 970 F.2d 885, 887, 23 USPQ2d 1627 1629 (Fed.Cir.1992). The reasonableness of a party's apprehension of suit involves an objective inquiry. *Id.* at 888, 970 F.2d 885, 23 USPQ2d at 1629. In undertaking this inquiry, we "look for any express charges of infringement, and if none, then to the 'totality of the circumstances.'" *Id.,* 970 F.2d 885, 23 USPQ2d at 1630 (quoting *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736, 6 USPQ2d 1685, 1689 (Fed.Cir. 1988)). The district court determined that ALZA's actions did not place Cygnus in reasonable apprehension of a suit for infringe-

ment of the '580 patent. The court found that "ALZA did not explicitly threaten Cygnus with an infringement suit, nor did ALZA's conduct and actions give rise to an objectively reasonable apprehension on the part of Cygnus that it would face an infringement suit."

■ On appeal, Cygnus argues that the district court erred in concluding that Cygnus did not have an objectively reasonable apprehension of being sued. In so doing, it points to: (1) the luncheon meeting between Dr. Shaw and Dr. Cleary on January 6, 1989; (2) Dr. Shaw's February 1989 letter to Mr. Lippert following the issuance of the reexamination certificate for the '580 patent; (3) the statements made by Mr. Gerstel at the Hambrecht and Quist Healthcare Conference in January of 1991; and (4) ALZA's refusal to negotiate a licensing agreement for the subject matter of the '580 patent with Anaquest. Cygnus contends that Dr. Shaw's statements at the luncheon constituted a direct threat of infringement. In addition, it argues that these statements, as well as other statements and conduct on behalf of ALZA "reaffirmed to Cygnus and to others in the industry what [ALZA] would do if Cygnus continued its patch development." Consequently, Cygnus argues, the totality of the circumstances supports its claim of a reasonable apprehension of suit. We disagree.

First, as far as the luncheon meeting between Dr. Cleary and Dr. Shaw is concerned, we do not believe that the district court erred in concluding that Dr. Shaw did not threaten Cygnus with an infringement suit. Viewed in the context of the meeting, the statements attributed to Dr. Shaw by Dr. Cleary did not constitute an "express threat." In fact, Dr. Shaw's statement that ALZA wanted to avoid litigation would seem to indicate a desire *not* to have to enforce the '580 patent. Moreover, the luncheon meeting occurred more than five years before Cygnus filed its complaint. Any implicit threat that one may argue was conveyed by Dr. Shaw at that time could hardly be said to have had any significant continuing effect on Cygnus five years later, when, as discussed below, ALZA engaged in no threatening conduct in the interim.

The next event about which Cygnus complains is Dr. Shaw's letter to Mr. Lippert. In her letter, Dr. Shaw informed Mr. Lippert that the '580 patent had survived reexamination. We see nothing exceptional in this letter. It strikes us as entirely reasonable for a patent owner who is having licensing discussions with a party to inform that party that the patent at issue has survived reexamination.

Nor do we believe that Mr. Gerstel's statement at the Hambrecht and Quist Healthcare Conference was such as to give rise to a reasonable apprehension of suit. Mr. Gerstel's statement that ALZA's patents were valid and that ALZA took a "very strong proprietary position" was made in response to a question from the audience. Moreover, we find Mr. Gerstel's statement to be precisely what one would expect in the circumstances. *See Shell Oil,* 970 F.2d at 889, 23 USPQ2d at 1631 (considering the circumstances surrounding statement of intent to enforce patent). It is difficult to imagine a businessman in Mr. Gerstel's position—when asked about his company's policy with respect to enforcement of its patents at a meeting attended by institutional investors—responding any differently than Mr. Gerstel did to the question from the audience.

█ As for ALZA's refusal to license the subject matter of the '580 patent, totally apart from the constraints of its contractual relationship with Janssen, ALZA was under no obligation to license its fentanyl patch. The patent statute grants a patentee the right to *exclude* others from making, using, or selling the patented invention. 35 U.S.C. §§ 154, 271(a) (1994). Indeed, a patentee may, if it wishes, do nothing with the subject matter of the patent. *See King Instruments Corp. v. Perego,* 65 F.3d 941, 950–51, 36 USPQ2d 1129, 1135–36 (Fed.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1675, 134 L.Ed.2d 778 (1996) ("This court should not presume to determine how a patentee should maximize its reward for investing in innovation.... The market may well dictate that the best use of a patent is to exclude infringing products, rather than market the invention.... Requiring exploitation would force patent owners to accept a reasonable royalty in cases where a reasonable royalty is inadequate compensation.").

This court stated recently that "[t]he purpose of [a] declaratory [judgment] action is to permit a threatened party to resolve its potential liability, but only when the relationship has progressed to an actual controversy, as required by Article III of the Constitution." *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha,* 57 F.3d 1051, 1053, 35 USPQ2d 1222, 1223 (Fed.Cir.1995). In addition, we pointed out that "[t]he 'reasonable apprehension of suit' test requires more than the nervous state of mind of a possible infringer; it requires that the objective circumstances support such an apprehension." *Id.* at 1053–54, 35 USPQ2d at 1224.

█ We conclude that, viewed in their totality, the "objective circumstances" in this case do not support a reasonable apprehension of suit. Essentially, what the facts show is this: ALZA's ownership of the '580 patent stands as a roadblock in the way of Cygnus's plans to produce and market its own fentanyl patch. At the same time, ALZA has declined to enter into a licensing arrangement with Cygnus, at least in part on account of its existing contractual relationship with Janssen. ALZA has not expressly threatened to sue Cygnus, however, and its various statements in the record concerning the '580 patent were either made in the setting of licensing discussions with Cygnus or Anaquest or in response to a third party query (the question at the Hambrecht and Quist Healthcare Conference). In short, Cygnus finds itself in the position of having its commercial objectives being frustrated by a competitor's ownership of a particular patent. That brings us to the fundamental problem that we have with the case advanced by Cygnus. Cygnus calls upon us to conclude that a reasonable apprehension of suit arises when a patentee does nothing more than exercise its lawful commercial prerogatives and, in so doing, puts a competitor in the position of having to choose between abandoning a particular business venture or bringing matters to a head by engaging in arguably infringing activity. To hold that ALZA's conduct between January of 1989 and May of 1993 constituted "objective circumstances" sufficient to sup-

port a reasonable apprehension of suit would be to set at an unacceptably low level the threshold that must be crossed before a district court may exercise declaratory judgment jurisdiction in a patent case. The district court did not err in dismissing Cygnus's claim for a declaratory judgment of invalidity and unenforceability with respect to the '580 patent.[1]

### III.

■■■ On appeal, Cygnus also challenges the district court's grant of summary judgment in favor of ALZA on its antitrust claim. We review *de novo* a district court's grant of summary judgment, *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994). A summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As noted above, the material facts are not in dispute.[2] Accordingly, we review the district court's grant of summary judgment to determine whether it is tainted by legal error.

■■■ Cygnus based its antitrust claim on *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). In *Walker Process*, the Supreme Court held that "the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present." *Id.* at 174, 86 S.Ct. at 348–49. In determining whether the district court correctly granted summary judgment in favor of ALZA on Cygnus's *Walker Process* claim, we apply the law of the regional circuit in which the district court sits. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 875, 228 USPQ 90, 99 (Fed.Cir.1985) ("We must approach a federal antitrust claim as would a court of appeals in the circuit of the district court whose judgment we review."). Ninth Circuit precedent thus guides our disposition of the appeal on this issue. In the Ninth Circuit, "[w]ithout some effort at enforcement, the patent cannot serve as the foundation of a monopolization case." *California Eastern Lab., Inc. v. Gould*, 896 F.2d 400, 403 (9th Cir.1990) (affirming a district court dismissal of a *Walker Process* claim under Fed.R.Civ.P. 12(b)(6) where the plaintiff did not allege that the defendant "actually attempted to enforce the patents").

■■■ Cygnus alleged that ALZA "procured the '580 patent through deliberate fraud on the Patent Office" by making misrepresentations about the prior art, and that "[i]t was solely on account of this fraudulent conduct that ALZA was able to obtain

---

1. Cygnus presented to the district court the declarations of David P. Richey and George Rathmann. Cygnus offered Dr. Richey and Dr. Rathmann as experts on the question of how ALZA's conduct would be viewed in the pharmaceutical industry. In their declarations, both Dr. Richey and Dr. Rathmann opined that it was reasonable for Cygnus to conclude that ALZA intended to sue for patent infringement in the event that Cygnus marketed a fentanyl patch. On appeal, Cygnus argues that the district court erred by not giving proper weight to the two declarations because it stated that, in its view, the "so-called experts' declarations" were invalid and that "[i]t's not an area of expertise to give your lay opinion about how you interpret things." It was within the discretion of the district court to accord the declaration such weight as it chose. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). In any event, we have reviewed the declarations and have found in them nothing to alter our conclusion with respect to the "objec-

tive circumstances" embodied in ALZA's conduct between January of 1989 and the date Cygnus filed suit.

2. Cygnus argues that the district court erred when it denied its request for additional discovery pursuant to Fed.R.Civ.P. 56(f). Although it took discovery of Anaquest, Cygnus contends it should have been allowed to take further discovery of ALZA and certain third parties on the issue of enforcement of the '580 patent. Had it been able to take such discovery, Cygnus argues, it would have been able to develop the facts essential to its opposition to the motion for summary judgment. Discovery rulings are reviewed for an abuse of discretion. *Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424, 25 USPQ2d 1547, 1548 (Fed.Cir.1993). We do not believe the district court abused its discretion when it denied Cygnus's request for additional discovery.

the '580 patent." Ever since issuance, Cygnus stated, "ALZA has been able to use the preclusive power of the '580 patent to stifle competition." According to Cygnus, "ALZA's strategy has been to use the '580 patent to instill the fear of expensive, unpredictable litigation in Cygnus and those who might partner with Cygnus to bring the Cygnus fentanyl patch to market." In granting summary judgment for ALZA on this issue, the district court did not address the question of whether the '580 patent had been obtained through fraud. Rather, the court concluded that "[b]ased upon the undisputed facts, Cygnus has failed to establish that ALZA enforced the '580 patent in any anticompetitive manner within the meaning of *Walker Process* and *California Eastern*."

Cygnus urges that the district court erred in granting summary judgment for ALZA because ALZA's actions "more than evidenced its intent to enforce its patent." The contention is without merit. It is enough to simply point out that the same facts that compel the conclusion that Cygnus failed to establish declaratory judgment jurisdiction for the district court also compel the conclusion that no reasonable fact finder could find that ALZA has acted to enforce the '580 patent. We discern no error in the grant of summary judgment in favor of ALZA on Cygnus's antitrust claim.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

## COSTS

Each party shall bear its own costs.

*AFFIRMED*