**NEIL BROTHERS LIMITED,**
Plaintiff,

v.

**WORLD WIDE LINES, INC., APS Promotional Solutions, Inc and John Does I–III, Defendants.**

**No. 05–CV–1198 ADS JO.**

United States District Court,
E.D. New York.

Nov. 2, 2005.

Galgano & Burke, LLP by Daniel P. Burke, Esq., Hauppauge, NY, for Plaintiff.

Pitney Hardin LLP by Marc A. Lieberstein, Esq., New York City, for the Defendant World Wide Lines, Inc.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This case arose out of a dispute between Neil Brothers Limited ("Neil Brothers" or the "plaintiff"), World Wide Lines, Inc. ("World Wide"), and APS Promotional Solutions, Inc. ("APS"), regarding the manufacture and sale of novelty drinking mugs. The defendants APS and John Does, I–III have not appeared in this action. Presently before the Court is a motion by World Wide pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.") to dismiss Count III of the plaintiff's amended complaint for lack of subject matter jurisdiction.

## I. BACKGROUND

The following facts are derived from the amended complaint, unless otherwise noted, and are taken as true for the purpose of this motion.

### A. The Plaintiff's '099 and '775 Patents

The plaintiff is the owner of two United States Patents. Patent No. 6,759,099 B2 (the "'099 patent") is entitled "Decoration Method Using Thermochromic Ink," and was issued by the United States Patent and Trademark Office ("USPTO") on July 6, 2004. Patent No. 6,902,775 (the "'775 patent") is entitled "Decoration Method," and was issued by the USPTO on June 7, 2005. Both patents describe processes

employing "thermochromism." The definition of thermochromism is "the phenomenon of reversible change of color of a substance with change of temperature." *Webster's Third New International Dictionary* 2373 (1976). In other words, when thermochromic ink is applied to an article, application of heat to that article will cause the appearance of the ink to change. For example, the thermochromic ink might become transparent when heated, revealing a picture concealed beneath. When the heat is removed, the appearance of ink, and hence the object, reverts back to its original appearance.

The plaintiff alleges that, during or about December, 1997, Shinel Bhagi, Managing Director and an owner of Neil Brothers, met with representatives of an entity known as "Atlas Crystal Works, Inc." and operating as "World Wide Art Studios" ("World Wide Art"), which is a predecessor of the defendant World Wide. According to the plaintiff, at the meeting Bhagi described to World Wide Art a method for using thermochromic ink to make drinking mugs that change color when hot liquid is poured into them. World Wide Art expressed an interest in selling the color-change mugs and, on February 7, 1998 the plaintiff entered into a written agreement with World Wide Art for it to market in the United States mugs made employing the disclosed method. With instruction from Bhagi, World Wide Art manufactured and sold the mugs. Originally, the mugs were marketed under the trademark MYSTERY™, and later under the trademark MYSTIQUE®.

World Wide Art sold the plaintiff's mugs through September, 2003 and paid Neil Brothers a royalty on its sales. In September, 2003 World Wide Art changed ownership and became World Wide Line's, Inc. The plaintiff claims that (1) the trademark registration for the MYSTIQUE®

mark was transferred to World Wide when it acquired World Wide Art; (2) after September, 2003 World Wide continued to manufacture the color-change mugs with the MYSTIQUE® mark by the process introduced by Bhagi to World Wide Art; (3) the process disclosed from Bhagi to World Wide Art later became covered by the '099 and '775 patents; and (4) World Wide has not paid any royalties to the plaintiff from sales of the MYSTIQUE® mugs. These allegations form the basis of Counts I and II of the plaintiff's amended complaint.

### B. World Wide's '165 Patent

World Wide is the owner of United States Patent No. 6,281,165 (the "'165 patent") entitled "Thermochromatic Ink Covered Article Having Image Disposed Thereon and Method of Making the Same." The '165 patent was issued on August 28, 2001. Similar to the plaintiff's '099 and '775 patents, World Wide's '165 describes a method for manufacturing a product that changes its appearance when heated.

The plaintiff alleges that on January 27, 1998, Bhagi and several representatives from World Wide Art attended a convention in Texas where World Wide Art displayed and offered to sell the color-change mugs. Approximately one year later, World Wide Art filed or caused to be filed on its behalf the patent application which eventually became the '165 patent. As the successor in interest to World Wide Art, the defendant World Wide currently owns the rights to the '165 patent.

### C. The September 24, 2004 Meeting

In support of its motion, World Wide submitted the declaration of Mark Hobbs, President of World Wide; the declaration of Donald Godsey, the owner of World Wide; the declaration of Matthew Stavish,

Esq., annexing as exhibits a license agreement and three letter correspondence between the parties; and a transcript, video tape, and dvd recording of a September 24, 2004 meeting between the parties. Bhagi, Hobbs, and Godsey were present at the meeting. In opposition, the plaintiff submits Bhagi's declaration and the declaration of an independent businessman named James Peng.

From these documents the Court has learned that on September 24, 2004, the parties met for the purpose of negotiating an agreement whereby the parties would cross-license each other's patents. The parties dispute whether an agreement was actually reached at this meeting. World Wide claims that "the parties amicably ended" the meeting "with no threats of litigation being made" and that "a verbal, handshake agreement was reached." The plaintiff, as is apparent from its correspondence with World Wide shortly after the meeting, did not believe that an agreement was reached and thought that negotiations would continue.

On September 28, 2004, the plaintiff sent World Wide a letter purporting to reject what it perceived as World Wide's offer of a cross-royalty settlement extended on September 24, 2004. The plaintiff rejected the offer based on advice from legal counsel. Specifically, the plaintiff sought more favorable terms because of Neil Brothers' confidence in the strength of its own patents, and what it thought to be the comparative vulnerability of the defendant's '165 patent.

On October 29, 2004, World Wide responded in a letter signed by Hobbs. In this letter, World Wide denied any infringement of the plaintiff's '099 patent. Hobbs also informed the plaintiff that World Wide would not "engage in any future partnership"; criticized Neil Brothers' "obdurate position on the subject of

[Neil Brothers patents'] superiority as well as [Neil Brothers'] relentless pursuit to degrade the integrity of [the '165 patent]"; and promised to "defend [World Wide's] current position despite the consequences of time, cost, or potential outcome."

On March 3, 2005, the plaintiff commenced this action by filing a one count complaint alleging infringement of the '099 patent.

On March 16, 2005, Hobbs wrote to Bhagi. In his letter, Hobbs re-stated World Wide's position that they have not infringed on Neil Brothers' '099 patent. Hobbs continued that World Wide "will use unlimited sums of money as well as other resources to prove [their] argument and exonerate [themselves] from this unmerited lawsuit." In the second to last paragraph, Hobbs stated that World Wide:

[Is] in full understanding of [Neil Brothers'] intentions to manufacture thermocromatic mugs in China and then subsequently mass distribute the blank products into the United States as well as the United Kingdom. As you well know, and have known for many years, World Wide does possess valid "165" sublimation patents in both the U.S. and UK which prohibits [sic] any company other than World Wide Lines, Inc. from sublimating into a thermochromatic mug. We will vigorously defend these patents using every means of resources [sic] available and will not stop until the wrongdoing is corrected if you do choose this course of action.

In conclusion, Hobbs acknowledged that the parties were now on a "war footing" with each other.

On June 16, 2005 the plaintiff amended its complaint, adding two new causes of action. Count II of the plaintiff's amended complaint seeks damages and injunctive relief for infringement of the '775 patent. Count III seeks a declaration that the

defendant's '165 patent is invalid. The defendant now moves to dismiss Count III and argues that the court lacks subject matter jurisdiction over the declaratory cause of action because there is no "actual controversy" between the parties with respect to the '165 patent.

## II. DISCUSSION

### A. Rule 12(b)(1)

When considering a motion for lack of subject matter jurisdiction under Rule 12(b)(1), to resolve the jurisdictional question the Court may consider affidavits and other materials beyond the pleadings. *Robinson v. Gov't of Malaysia,* 269 F.3d 133, 141 & n. 6 (2d Cir.2001); *Antares Aircraft, L.P. v. Fed. Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991), *vacated on other grounds,* 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992); *Exch. Nat'l Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1130 (2d Cir.1976). Under Rule 12(b)(1), the Court must accept as true all material factual allegations in the complaint, but will not draw inferences favorable to the party asserting jurisdiction. *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998); *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 198 (2d Cir.1992). As the party seeking to invoke the jurisdiction of the Court, the plaintiff bears the burden of demonstrating that subject matter jurisdiction is proper based on facts existing at the time the claim under consideration was filed. *Scelsa v. City Univ. of N.Y.,* 76 F.3d 37, 40 (2d Cir.1996); *see Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 734 n. 2 (Fed.Cir.1988) (citations omitted).

Here, only Count III of the amended complaint is under consideration. Thus, it is appropriate for the Court to consider events occurring after the original complaint was filed, but prior to the amendment and addition of Count III.

### B. The Declaratory Judgment Act

The Declaratory Judgment Act (the "Act") provides, in pertinent part, that "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). The Act explicitly requires the existence of an "actual controversy" between the parties before a court can entertain jurisdiction. *Id.; see EMC Corp. v. Norand Corp.,* 89 F.3d 807, 810 (Fed.Cir. 1996).

The Federal Circuit has developed a two-pronged test to be used to determine whether an "actual controversy" exists in an action for a declaration of patent invalidity.

First, the defendant's conduct must have created on the part of the plaintiff a reasonable apprehension that the defendant will initiate suit if the plaintiff continues the allegedly infringing activity. Second, the plaintiff must actually have either produced the device or have prepared to produce that device.

*Goodyear Tire & Rubber Co. v. Releasomers Inc.,* 824 F.2d 953, 955 (Fed.Cir.1987) (citations omitted); *see Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha,* 57 F.3d 1051, 1052–53 (Fed.Cir.1995); *Shell Oil Co. v. Amoco Corp.,* 970 F.2d 885, 887–88 & n. 2 (Fed.Cir.1992); *Arrowhead,* 846 F.2d at 736. Neither party disputes that the second prong of this test has been met. Rather, the defendant argues that nothing it did was sufficiently threatening, so that the plaintiff could not have reasonably feared being sued for infringement of the '165 patent.

### C. As to the Plaintiff's "Reasonable Apprehension" of Litigation Involving the '165 Patent

Under the first prong of the "actual controversy" test, it is the plaintiff's

burden to show that it had an objectively reasonable apprehension that it will be sued for infringement of the '165 patent. *Shell Oil Co.*, 970 F.2d at 887; *see Indium Corp. of Am. v. Semi–Alloys, Inc.*, 781 F.2d 879, 883 (Fed.Cir.1985) (A "purely subjective apprehension of an infringement suit is insufficient to satisfy the actual controversy requirement."). A plaintiff's apprehension that it will be sued can be based on an express accusation of infringement. Or, when no express charge of infringement has been made, the plaintiff's apprehension can be based on the totality of the circumstances. *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 96, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993); *see also Vanguard Research, Inc. v. Peat, Inc.*, 304 F.3d 1249, 1254–54 (Fed.Cir.2002) ("To invoke the court's declaratory judgment jurisdiction, a plaintiff must show 'more than the nervous state of mind of a possible infringer,' but does not have to show that the patentee is 'poised on the courthouse steps.'") (quoting *Phillips*, 57 F.3d at 1053–54); *Arrowhead*, 846 F.2d at 736 ("In light of the subtleties in lawyer language . . . the courts have not required an express infringement charge.").

■ The plaintiff alleges in paragraph 63 of the amended complaint that Bhagi has spoken with Hobbs and Godsey, and that Godsey told Bhagi that if Neil Brothers imports the mugs into the United States then World Wide would initiate a patent infringement action against Neil Brothers. The plaintiff further alleges in paragraph 64 that it fully intends to import the mugs and to have designs imprinted on them. The plaintiff claims to have entered into a joint venture with James Peng, a declarant on this motion, to have color-change mugs manufactured in China and imported into the United States for sale. According to his declaration, Peng claims that he met Hobbs on March 30, 2005, and that Hobbs threatened him with a lawsuit if he continued the Peng–Bhagi joint venture.

World Wide does not dispute that it engaged in discussions with the plaintiff concerning its patents, but denies that it ever threatened the plaintiff or anyone else with a lawsuit. World Wide also denies engaging in any activity that could be construed as a threat of litigation over the '165 patent. Rather, World Wide characterizes the statements made by Hobbs and Godsey at the September 24, 2004 meeting and in their later correspondence as "pure positional statements," "jawboning," or a reservation of rights during the course of active negotiations. World Wide argues that even if they had indicated during negotiations that the plaintiff might infringe the '165 patent, the Court still is without declaratory judgment jurisdiction because World Wide was careful to maintain that they still desired to resolve any issues "quickly and amicably and without resort to litigation."

The Court finds that an actual controversy exists in this case with respect to the '165 patent. First, Bhagi and Peng both claim that World Wide explicitly threatened to sue for infringement of the '165 patent if Neil Brothers followed through on its plan to import the color-change mugs. Second, the March 16, 2005 letter from Hobbs to Bhagi was sufficiently threatening when considered in the entire context of the parties' strained relationship.

At the time the March 16, 2005 letter was written, negotiations between the parties had already broken down. Litigation between the parties had commenced. At that time all efforts to "resolve any issues quickly and amicably and without resort to litigation" had been abandoned. Admittedly, the parties were on a "war footing" with each other. To an objective observer, that letter is a warning that World Wide

will "strike back," so to speak, if the plaintiff follows through with its intention to import color-change mugs. World Wide is prepared to use "every resource available" in order to protect its '165 patent and "stop the wrongdoing." What "wrongdoing" is Hobbs referring to if not patent infringement? What "resources" will World Wide make use of other than judicial process? Considering the combative posture of the parties, it is unlikely that World Wide intended this letter to express anything other than its clear intention to enforce its patent rights by litigation. *See Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 737 n. 7 (Fed.Cir. 1988); *Oce–Office Systems, Inc. v. Eastman Kodak Co.,* 805 F.Supp. 642, 646–47 (N.D.Ill.1992); *see also EMC Corp. v. Norand Corp.,* 89 F.3d 807, 812 (Fed.Cir. 1996) ("the question is whether the relationship between the parties can be considered a 'controversy' "); *compare Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha,* 57 F.3d 1051, 1053 (Fed.Cir. 1995) ("[A] litigation controversy normally does not arise until the negotiations have broken down.").

World Wide claims that the statements made in the March 16, 2005 letter were defensive in nature. Belying this contention is the fact that World Wide was the party that initially raised the issue of the '165 infringement in this action. The '165 patent was not mentioned in the plaintiff's original complaint filed on March 3, 2005. World Wide opened the door in its March 16, 2005 letter, and it was not unreasonable for the plaintiff to prefer not to immediately abandon its business arrangement with Peng or to wait for World Wide to attempt to enforce its patent in another forum. Instead, the plaintiff took the initiative to seek a determination of the parties' rights. *See Arrowhead,* 846 F.2d at 735 (stating that the Declaratory Judgment Act allows competitors to clear the air and avoid being forced to make an *"in*

*terrorem* choice between the incurrence of a growing liability for patent infringement and abandonment of their enterprises"); *EMC Corp.,* 89 F.3d at 812 (patentee who first approached alleged infringer was not "quiescent" party unfairly brought into declaratory judgment suit); *Phillips,* 57 F.3d at 1053 ("[T]he purpose of the Declaratory Judgment Act is to enable those threatened to remove such a cloud on their commercial activity, instead of being obliged to await the convenience of the threatening party") (citation omitted). Accordingly, World Wide's motion to dismiss Count III in the amended complaint is denied.

## III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED**, that the motion by the defendant World Wide Lines, Inc. pursuant to Fed.R.Civ.P. 12(b)(1) to dismiss Count III of the amended complaint for lack of subject matter jurisdiction is **DENIED**.

**SO ORDERED.**