EMC CORPORATION, Plaintiff–Appellant,

v.

NORAND CORPORATION, Defendant–Appellee.

No. 95–1540.

United States Court of Appeals, Federal Circuit.

July 11, 1996.

Rehearing Denied; Suggestion for Rehearing In Banc Declined Aug. 16, 1996.

---

Richard L. Stanley, Arnold, White & Durkee, Houston, Texas, argued for plaintiff-appellant. With him on the brief were Wayne M. Harding and Gay L. Bonorden. Of counsel were Paul T. Dacier and John M. Gunther, EMC Corporation, Hopkinton, Massachusetts, and Thomas J. Dougherty and James R. Carroll, Skadden, Arps, Slate, Meagher & Flom, Boston, Massachusetts.

Lawrence M. Jarvis, McAndrews, Held & Malloy, Ltd., Chicago, Illinois, argued for defendant-appellee. With him on the brief were William M. Wesley and Christopher C. Winslade. Of counsel were Gael Mahony and Timothy J. Dacey, III, Hill & Barlow, Boston, Massachusetts.

Before MAYER, SCHALL, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

EMC Corporation filed an action in the United States District Court for the District of Massachusetts seeking a declaratory judgment against Norand Corporation. EMC requested that the court declare certain patents owned by Norand to be invalid and to declare that EMC did not infringe those patents. The district court dismissed the action, exercising its discretion to decline jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201(a). Because we conclude that the district court did not abuse the broad discretion accorded it by the Act, we affirm.

## I

The parties present widely divergent versions of the circumstances that led to EMC's filing of its request for a declaratory judgment. Because the district court decided this case without making findings of fact, we confine ourselves to those facts that are undisputed.

EMC manufactures disk drive storage subsystems. Norand does not manufacture or sell such devices but holds four United States patents on technology in that general field. In August 1994, W. Mark Goode, the president of a consulting company representing Norand, wrote to an EMC vice president suggesting that Norand and EMC initiate license negotiations related to Norand's patents. After receiving no reply to his letter, Goode sent a letter to Paul Dacier, EMC's General Counsel, again suggesting license negotiations. In the letter, Goode stated that Norand had "requested that we simply turn the matter over to McAndrews, Held & Malloy [Norand's outside patent counsel] for action," but that he wanted to have a preliminary business discussion, "perhaps avoiding this matter escalating into a contentious legal activity."

EMC officials agreed to meet with Norand. Norand's outside patent counsel then contacted EMC and requested that the meetings not be used as a basis for filing a declaratory judgment action. EMC and Norand held meetings in September and October 1994 in which the parties discussed the potential sale or license of the patents. EMC alleges that Norand's representatives made explicit claims of infringement by EMC at the meetings; Norand denies that its representatives made any such claims or otherwise threatened suit.

At the parties' third meeting, held on January 19, 1995, Norand informed EMC that there were six other companies in EMC's market that Norand was approaching regarding the sale or licensing of its patents. Goode subsequently sent a letter to EMC officials confirming plans for a fourth meeting and assuring EMC that he would call later in the week to arrange a time for the meeting. Three days later, however, EMC filed its declaratory judgment action in the United States District Court for the District of Massachusetts. A telephone message left by an EMC attorney on the day after the filing indicated that EMC had taken the step because its management "thought it was in their interest to protect themselves first and continue discussions." The parties held two further meetings while the action was pending and scheduled a third meeting, but that meeting was later canceled.

Norand moved to dismiss the complaint for lack of jurisdiction on the ground that EMC had failed to establish that there was a justiciable case or controversy between the parties. In addressing the motion, the district court first considered whether Norand's conduct gave rise to a reasonable apprehension that Norand would sue EMC for patent infringement. The court found that making that determination would be a significant undertaking and would involve a close question. The court therefore decided that it would not determine whether EMC could prove a case or controversy for jurisdictional purposes, but that it would exercise its discretion under the Declaratory Judgment Act to decline to entertain the action.

The court found that the parties were still in active license or sale negotiations, that Norand was not a competitor of EMC, and that it was considering entering negotiations with others as well. Under those circum-

stances, the court concluded, to entertain the declaratory judgment action would be inconsistent with the purposes of the Declaratory Judgment Act. In particular, the court found, to allow a declaratory judgment action to proceed under such circumstances would encourage parties who were negotiating with patentees to use the declaratory judgment procedure to improve their bargaining positions and to impede negotiations between patentees and other potential licensees or buyers. The court explained that a plaintiff in EMC's position

> may be able to obtain a more favorable bargaining position with the defendant by filing a declaratory judgment action, thereby inducing if not virtually forcing defendant to consider whether as a practical matter it would be better to avoid litigation costs and any risk of adverse rulings that might render their patents less valuable. It would be reasonable to expect that, if there is in fact a market for the patents, the mere pendency of the lawsuit may negatively affect the value of the defendant's patents in that market and the price any potential purchaser, either the plaintiff or another prospective purchaser, might be willing to pay.

The court added that a plaintiff such as EMC "may prefer that a defendant, such as Norand, own a patent rather than that a competitor of the plaintiff own the patent," as a competitor might be more likely to try to enforce the patent against EMC than Norand would. In that setting, the district court concluded, the pendency of a declaratory judgment action might have the effect of impeding the sale of the patent to the plaintiff's competitor, regardless of whether it was filed for that reason. The court therefore determined that to exercise its discretionary jurisdiction in this case would create "an incentive structure that is inconsistent with the public interest in preserving declaratory proceedings for cases closer to the central objectives of declaratory proceedings."

## II

The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides in pertinent part:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

The Act, paralleling Article III of the Constitution, requires an actual controversy between the parties before a federal court may exercise jurisdiction over an action for a declaratory judgment. *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937); *Shell Oil Co. v. Amoco Corp.,* 970 F.2d 885, 887, 23 USPQ2d 1627, 1629 (Fed.Cir.1992). In general, the presence of an "actual controversy" within the meaning of the statute depends on "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941); *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 735, 6 USPQ2d 1685, 1688 (Fed.Cir.1988).

Even if there is an actual controversy, the district court is not required to exercise declaratory judgment jurisdiction, but has discretion to decline that jurisdiction. *Public Serv. Comm'n v. Wycoff Co.,* 344 U.S. 237, 241, 73 S.Ct. 236, 239, 97 L.Ed. 291 (1952). As this court summarized in *Spectronics Corp. v. H.B. Fuller Co.,* 940 F.2d 631, 634, 19 USPQ2d 1545, 1547 (Fed.Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991): "When there is no actual controversy, the court has no discretion to decide the case. When there is an actual controversy and thus jurisdiction, the exercise of that jurisdiction is discretionary."

The district court did not decide whether this case presented an actual case or controversy, as it concluded that it would dismiss as a discretionary matter even if it found that it had jurisdiction. EMC argues that the district court erred in bypassing the question of jurisdiction and contends that there is a sufficient case or controversy as a matter of law.

In addition, EMC argues that the district court abused its discretion by not relying on any of the "legitimate bases for exercising discretion not to hear a declaratory judgment action."

### A

■ We agree with EMC that the undisputed facts establish a sufficient controversy between the parties to give the district court statutory and constitutional authority to hear this declaratory judgment action. We therefore find it unnecessary to decide whether it was appropriate for the district court to bypass the issue of jurisdiction without deciding that issue.

■ This court has developed a two-part inquiry to determine whether there is an actual controversy in suits requesting a declaration of patent non-infringement or invalidity. First, the plaintiff must actually produce or be prepared to produce an allegedly infringing product. Second, the patentee's conduct must have created an objectively reasonable apprehension on the part of the plaintiff that the patentee will initiate suit if the activity in question continues. *Spectronics*, 940 F.2d at 634, 19 USPQ2d at 1548; *Arrowhead*, 846 F.2d at 736, 6 USPQ2d at 1689.

■ The parties do not dispute that EMC satisfies the first part of the test. We therefore address only the question whether Norand's conduct placed EMC in reasonable apprehension that it would be sued for infringing Norand's patent rights. To put a putative infringer in reasonable apprehension of suit does not require an express charge of infringement and threat of suit; rather, such apprehension may be induced by subtler conduct if that conduct rises "to a level sufficient to indicate an intent [on the part of the patentee] to enforce its patent," *i.e.*, to initiate an infringement action. *Shell Oil*, 970 F.2d at 887, 23 USPQ2d at 1629–30; *see also Arrowhead*, 846 F.2d at 736, 6 USPQ2d at 1689.

■■ A certain minimum degree of adverseness must be present in order to establish the requisite controversy. Thus, "more is required than the existence of an adversely held patent." *BP Chemicals Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978, 28 USPQ2d 1124, 1126 (Fed.Cir.1993). A patentee's offer of a license, without more, is insufficient to establish the predicate for declaratory judgment jurisdiction, *Indium Corp. v. Semi–Alloys, Inc.*, 781 F.2d 879, 883, 228 USPQ 845, 848 (Fed.Cir.1985), *cert. denied*, 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986), and merely "proposed or ongoing license negotiations" are likewise insufficient, *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051, 1053, 35 USPQ2d 1222, 1224 (Fed.Cir.1995). But when the patentee takes steps that create a reasonable apprehension that he will seek redress through the courts, the alleged infringer is not required to wait for the patentee to decide when and where to sue, but can take the initiative and seek declaratory relief.

To be sure, any time parties are in negotiation over patent rights, the possibility of a lawsuit looms in the background. No patent owner with any sense would open negotiations by assuring his opposite party that he does not intend to enforce his patent rights under any circumstances. The threat of enforcement—either directly by the patentee or indirectly by a third party to whom the patentee licenses or sells the patent—is the entire source of the patentee's bargaining power. *See Shell Oil*, 970 F.2d at 888, 23 USPQ2d at 1631 (patentee, if asked whether it intends to enforce its patent must answer "yes" if it hopes to negotiate a license). Thus, it is unrealistic to suggest that some negotiating patentees intend to enforce their patents while some do not, and that the first group is subject to declaratory judgment actions while the second is not.

This court's two-part test for declaratory judgment jurisdiction is designed to police the sometimes subtle line between cases in which the parties have adverse interests and cases in which those adverse interests have ripened into a dispute that may properly be deemed a controversy. The test for finding a "controversy" for jurisdictional purposes is a pragmatic one and cannot turn on whether the parties use polite terms in dealing with one another or engage in more bellicose saber rattling. The need to look to substance

rather than form is especially important in this area, because in many instances (as in this case) the parties are sensitive to the prospect of a declaratory judgment action and couch their exchanges in terms designed either to create or defeat declaratory judgment jurisdiction. In the end, the question is whether the relationship between the parties can be considered a "controversy," and that inquiry does not turn on whether the parties have used particular "magic words" in communicating with one another. *See Phillips Plastics,* 57 F.3d at 1053, 35 USPQ2d at 1223 ("one who may become liable for infringement should not be subject to manipulation by a patentee who uses careful phrases in order to avoid explicit threats").

In this case, we conclude that an "actual controversy" was present. In particular, the undisputed evidence makes it clear that Norand's conduct created a reasonable apprehension on EMC's part that Norand would sue if EMC did not satisfy Norand's economic demands. The most telling evidence on that issue is the August 19, 1994, letter that Goode sent to Dacier, EMC's general counsel. The letter referred to Norand's inclination to "turn the matter over to" Norand's litigation counsel "for action," and urged a "preliminary business discussion," "perhaps avoiding this matter escalating into a contentious legal activity." That language plainly suggested that Norand's management favored filing suit immediately and had to be persuaded by its consultant to hold off for a period of time necessary to seek a solution short of litigation. An objective reader of Goode's August 19 letter could only conclude that Norand had already decided EMC was infringing its patents and that Norand intended to file suit unless it could obtain satisfaction without having to sue.

Norand argues that the August 19 letter was merely an invitation to engage in a licensing discussion, of the sort that was held not to create a justiciable controversy in *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha, supra.* In *Phillips Plastics,* however, the patentee had not stated or even hinted that it would pursue legal recourse if it were not satisfied with the outcome of the proposed licensing negotiations. This court

held that where all that is present is negotiation unaccompanied by threats of legal action, the setting is not sufficiently adverse to create a justiciable controversy. That principle, however, is inapplicable in a case such as this one, where the patentee has made explicit references to the prospect of initiating legal action.

This case is also unlike those in which it was the declaratory judgment plaintiff, not the patentee-defendant, who first approached the opposing party. *See Shell Oil,* 970 F.2d at 888, 23 USPQ2d at 1630–31 (no apprehension of suit where patentee was approached by declaratory judgment plaintiff, and patentee merely defended the validity of its patent in negotiations). Unlike in *Shell Oil,* it was Norand, the patentee, that approached EMC, not the reverse. Moreover, in making that contact, Norand did not simply invite EMC to engage in licensing negotiations, but specifically alluded to the prospect of "contentious legal activity."

The *Shell Oil* case exemplifies the broader principle that a declaratory judgment action should not be used to force unwanted litigation on "quiescent patent owners." *Arrowhead,* 846 F.2d at 736, 6 USPQ2d at 1689; *see also West Interactive Corp. v. First Data Resources, Inc.,* 972 F.2d 1295, 23 USPQ2d 1927 (Fed.Cir.1992) (no apprehension of suit where patentee made no contact with declaratory judgment plaintiff, and sole source of plaintiff's apprehension was patentee's alleged statement to an unrelated party that plaintiff was infringing the patents at issue). That principle is inapplicable here, as Norand certainly does not qualify as a "quiescent" patentee.

In the weeks following Goode's August 19 letter, EMC and Norand held three meetings at which they discussed the possibility of licensing the Norand patents. Norand's outside litigation counsel was present at each meeting. Although the parties dispute whether Norand made any charges of infringement or threats of suit during that period, we do not regard the resolution of that question to be essential to determining whether there was an actual controversy between the parties at the time EMC filed suit. Goode's letter made it reasonably clear that

Norand intended to resort to litigation if it were not satisfied with the results of the parties' negotiations. Nothing that EMC offered by way of evidence suggested that Norand had abandoned that posture during the ensuing weeks. Moreover, the amount of Norand's licensing offer—$1.5 million plus two percent of sales for a nonexclusive license—was sufficiently large to make the prospect of ultimate litigation even more realistic.

We conclude from the undisputed evidence before the district court that Norand and EMC had adverse interests and that those adverse interests had ripened into a concrete dispute by the time EMC filed its complaint. EMC's complaint therefore satisfied the case or controversy requirement of the Constitution as well as the "case of actual controversy" requirement of the Declaratory Judgment Act.

### B

■ Simply because there is an actual controversy between the parties does not mean that the district court is required to exercise that jurisdiction. The Act states that a court *may* grant declaratory relief. The Supreme Court recently reaffirmed that the Declaratory Judgment Act thereby accords district courts a "unique breadth of ... discretion to decline to enter a declaratory judgment." *Wilton v. Seven Falls Co.,* ·— U.S. —, —, 115 S.Ct. 2137, 2143, 132 L.Ed.2d 214 (1995) (rejecting the argument that district courts are authorized to decline to exercise declaratory judgment jurisdiction only in "exceptional circumstances"). The Court noted that the Declaratory Judgment Act is "an enabling Act" that confers on district courts "unique and substantial discretion in deciding whether to declare the rights of litigants." *Id.* at —, 115 S.Ct. at 2142. The Court characterized the Act as "plac[ing] a remedial arrow in the district court's quiver" and as "creat[ing] an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." *Id.* at —, 115 S.Ct. at 2143. In expounding on the "unique breadth" of the district court's discretion, the Court· explained that "[t]he statute's textual commitment to discretion, and the breadth of leeway

we have always understood it to suggest, distinguish the declaratory judgment context from other areas of the law in which concepts of discretion surface." *Id.* at —, 115 S.Ct. at 2142.

■ The Court in *Wilton* also addressed the appropriate standard of review by appellate courts of a district court's exercise of its discretion to decline jurisdiction under the Declaratory Judgment Act. Recognizing a difference of approach among the circuits, the Court adopted a deferential "abuse of discretion" standard and explicitly rejected the more probing review previously practiced by this court. — U.S. at — -- —, 115 S.Ct. at 2143–44 (citing *Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 936, 27 USPQ2d 1241, 1243–44 (Fed.Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 1126, 127 L.Ed.2d 434 (1994)). In particular, the Court concluded that it was appropriate to vest district courts with discretion "in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp." *Wilton,* — U.S. at —, 115 S.Ct. at 2143. In light of the clear directions from the Supreme Court, we must limit our review of the district court's decision to decline jurisdiction in this case to whether the court abused the "unique and substantial discretion" granted it under the Declaratory Judgment Act.

■■ EMC is correct in contending that the district court's discretion is not unfettered. A district court, for example, "cannot decline to entertain [a declaratory judgment] action as a matter of whim or personal disinclination." *Public Affairs Assocs., Inc. v. Rickover,* 369 U.S. 111, 112, 82 S.Ct. 580, 582, 7 L.Ed.2d 604 (1962). Nor can a district court dismiss a declaratory judgment action merely because a parallel patent infringement suit was subsequently filed in another district; to take such action without any other reasons, this court has held, would be contrary to the general rule favoring the forum of the first-filed action. *See Genentech,* 998 F.2d at 937, 27 USPQ2d at 1244. On the other hand, as long as the district court acts in accordance with the purposes of the Declaratory Judgment Act and the prin-

ciples of sound judicial administration, the court has broad discretion to refuse to entertain a declaratory judgment action. *See Serco Servs. Co., L.P. v. Kelley Co., Inc.*, 51 F.3d 1037, 1039, 34 USPQ2d 1217, 1218 (Fed.Cir. 1995) (court may dismiss declaratory judgment action if its action is based on "a reasoned judgment whether the investment of time and resources will be worthwhile").

■ EMC argues that it should be an abuse of discretion for a district court to dismiss a declaratory judgment action except when special circumstances are present, such as when the court lacks jurisdiction over all the necessary parties, when the suit is filed in an inconvenient forum, or when the declaratory judgment action would interfere with proceedings in another forum. We disagree. We detect no such implied restriction on the scope of the district court's discretion, as described by the Supreme Court in *Wilton.* Rather, we heed the Supreme Court's instruction that special flexibility is called for in the declaratory judgment context, where "the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Wilton*, — U.S. at —, 115 S.Ct. at 2143. It is appropriate, therefore, for a district court to examine whether hearing the declaratory judgment action would serve the objectives for which the Declaratory Judgment Act was created.

■ In this case, the district court based its decision to decline jurisdiction on its conclusion that allowing the declaratory judgment action to proceed would "creat[e] an incentive structure that is inconsistent with the public interest in preserving declaratory proceedings for cases closer to the central objectives of declaratory proceedings . . . ." The court explained that a party in EMC's position could abuse the declaratory judgment device to obtain a more favorable bargaining position in its ongoing negotiations with the patentee and also to undermine the value of the patent so as to impede its sale or licensing to a third party.

In addition, in explaining the reasons for its discretionary dismissal, the district court cited *Davox Corp. v. Digital Systems International, Inc.*, 846 F.Supp. 144, 26 USPQ2d 1231 (D.Mass.1993). There, the court declined to exercise jurisdiction over a declaratory judgment action in which the plaintiff filed suit while still engaged in negotiations with the patentee. Dismissal was proper there, the court observed, because "it would be inappropriate to reward—and indeed abet—conduct which is inconsistent with the sound policy of promoting extrajudicial dispute resolution, and conservation of judicial resources." *Davox Corp.*, 846 F.Supp. at 148, 26 USPQ2d at 1234. We agree that a court may take into account the pendency of serious negotiations to sell or license a patent in determining to exercise jurisdiction over a declaratory judgment action. While a court may conclude that ongoing negotiations do not negate the presence of a controversy for jurisdictional purposes, the court may nonetheless find, in deciding whether to hear the declaratory judgment action, that the need for judicial relief is not as compelling as in cases in which there is no real prospect of a non-judicial resolution of the dispute. *See NSI Corp. v. Showco, Inc.*, 843 F.Supp. 642, 645–46, 30 USPQ2d 1546, 1549 (D.Or.1994) (declaratory judgment plaintiff "took advantage of the fact that [patentee] had deferred the filing of expensive and probably protracted litigation because of its belief that settlement negotiations were under way"); *Bausch & Lomb Inc. v. Alcide Corp.*, 684 F.Supp. 1155, 1160, 5 USPQ2d 1612, 1616 (W.D.N.Y. 1987) (dismissing declaratory judgment action filed just after defendant sent letter offering to resolve the dispute without resorting to litigation; "[t]o allow this action to proceed would be to discourage such good faith effort to negotiate").

In *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, 846 F.2d at 734–35, 6 USPQ2d at 1688, this court described the type of situation the Declaratory Judgment Act was intended to address:

[A] patent owner engages in a *danse macabre*, brandishing a Damoclean threat with a sheathed sword . . . . Guerilla-like, the patent owner attempts extra-judicial patent enforcement with scare-the-customer-and-run tactics that infect the competitive environment of the business communi-

ty with uncertainty and insecurity.... Before the Act, competitors victimized by that tactic were rendered helpless and immobile so long as the patent owner refused to grasp the nettle and sue. After the Act, those competitors were no longer restricted to an *in terrorem* choice between the incurrence of a growing potential liability for patent infringement and abandonment of their enterprises; they could clear the air by suing for a judgment that would settle the conflict of interests.

*See also BP Chemicals,* 4 F.3d at 977, 28 USPQ2d at 1126 ("The purpose of the Act is to enable a person who is reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side. It accommodates the practical situation wherein the interests of one side to the dispute may be served by delay in taking legal action."). In the terms used in *Arrowhead* and *BP Chemicals,* a patentee in the midst of active negotiations may not be leaving the other party "immobile" or "helpless" and may not be benefiting from the delay. Instead, the patentee may be attempting to avoid litigation by engaging the other party in extra-judicial dispute resolution.

Of course, there may be situations in which the patentee has entered negotiations with an alleged infringer but nonetheless is engaging in the "danse macabre" referred to in *Arrowhead,* feigning interest in continued negotiations merely to deflect a declaratory judgment action. Such manipulation could well justify a district court's decision to accept a declaratory judgment action. In any event, the alleged infringer can usually avoid that problem altogether simply by cutting off negotiations if it appears that the patentee is not negotiating in good faith.

In this case, EMC and Norand were involved in negotiations over the sale or licensing of Norand's patents up to the time the complaint was filed. Although EMC complains that Norand's position in the negotiations was unreasonable, there is no suggestion in any of the evidence proffered by EMC that Norand's participation in the negotiations was merely a pretext designed to give Norand a basis for keeping EMC from obtaining declaratory judgment relief.

Moreover, the circumstances surrounding and immediately following the filing of the complaint lend further support to the district court's decision not to exercise its jurisdiction in this case. The complaint was filed shortly after Norand informed EMC of its plans to enter negotiations with EMC's competitors. The day after the complaint was filed, EMC's senior intellectual property counsel called Norand's outside patent counsel and explained that the declaratory judgment complaint had been filed as "merely a defensive step" and that EMC "would like to continue to discuss with you all the options hopefully in a more meaningful manner over the near term." By way of explaining why the complaint was filed, EMC's counsel added that EMC's management decided to file suit because "they just thought it was in their interest to protect themselves first and continue discussions." Under these circumstances, the district court could properly view the declaratory judgment complaint as a tactical measure filed in order to improve EMC's posture in the ongoing negotiations—not a purpose that the Declaratory Judgment Act was designed to serve.

In sum, the district court was able to determine from the undisputed facts that this case was not one that furthered the objectives of the Declaratory Judgment Act. In light of the limited scope of our review, we cannot conclude that the district court's decision on that issue was so contrary to "the teachings and experience concerning the functions and extent of federal judicial power," *Public Serv. Comm'n v. Wycoff Co.,* 344 U.S. at 243, 73 S.Ct. at 240, that it constituted an abuse of discretion.

*AFFIRMED.*