108 F.3d 1394
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
RODGARD CORPORATION and Estate of Mason C. Winfield,
Plaintiffs-Appellants,
v.
MINER ENTERPRISES, INC. and David G. Anderson, Defendants,
Cross-Appellants.
 Nos. 96-1229, 96-1243.
 United States Court of Appeals, Federal Circuit.
 March 13, 1997.
Rehearing Denied April 8, 1997.
 
 Before RICH, CLEVENGER, and BRYSON, Circuit Judges.
 DECISION
 BRYSON, Circuit Judge.
 
 
 1
 Rodgard Corporation and Estate of Mason C. Winfield (collectively Rodgard) appeal, and Miner Enterprises, Inc., and David G. Anderson (collectively Miner) cross-appeal, from a judgment of the United States District Court for the Western District of New York. The district court rejected Rodgard's challenges to the validity of U.S. Patent No. 4,198,037 (the '037 patent), denied Rodgard's request for a declaration naming Winfield as a co-inventor of the '037 patent, and rejected each of Rodgard's claims based on state-law causes of action. The court also rejected Miner's counterclaims, including its request for attorney fees. We affirm-in-part, vacate-in-part, and remand.
 
 BACKGROUND
 
 2
 Miner manufactures compression pads for railroad cars. The pads, which are designed to absorb and soften the impact of the cars during transportation and coupling, contain springs made of a copolymer polyester elastomer that is sold under the trademark "Hytrel." The Hytrel springs are bonded to metal plates, and a number of the spring-plate units are placed end-to-end in the compression pad.
 
 
 3
 In 1976, Rodgard's president, Mason Winfield, met with David Anderson, a Miner engineer, to discuss whether Rodgard would manufacture the Hytrel springs and supply them to Miner. That meeting resulted in a contract between Rodgard and Miner that called for Rodgard to fabricate Hytrel springs for bonding to metal plates supplied by Miner. In exchange for Rodgard's disclosure of its manufacturing techniques, Miner agreed to give Rodgard preferential consideration for supplying Miner's future domestic production needs.
 
 
 4
 Pursuant to the 1976 contract, Anderson and Winfield began to work together. During their association, Winfield disclosed to Anderson a technique for eliminating voids in the Hytrel springs by subjecting the Hytrel material to pressure at a particular step in the manufacturing process. The parties also developed a method for mechanically bonding the springs to the metal plates.
 
 
 5
 In January 1977, the parties executed a second contract. The 1977 contract specified that Miner would provide internal Miner information to Rodgard on a confidential basis to enable Rodgard to determine whether it would manufacture Hytrel spring components for Miner. The contract required Miner to give Rodgard "primary consideration" as the manufacturer and supplier of Miner's Hytrel compression pads, and it required Rodgard to give "primary production consideration to Miner's requirements for compression pads." The contract further provided that Miner and Rodgard would work exclusively together during the "research and development phase" until Miner's compression pads were ready for sale in the commercial market. Finally, the contract required the parties to maintain their proprietary information "confidential and secret (whether made available before or after the date of the [1977 contract]," but it permitted Miner to divulge information to Miner's "authorized licensees abroad on a confidential basis [and subject to an agreement not to divulge to any third party or parties] for possible use abroad." After signing the 1977 contract, the parties continued their joint development of the Hytrel springs.
 
 
 6
 In May 1981, the parties signed a third contract. Under that contract, Winfield received an annual fee in exchange for which he agreed to assist Miner "in setting up a manufacturing line for spring products." The parties also agreed to keep secret the information regarding their "business, processes, apparatus, inventions, products, designs, researches, research programs and formulae that were made known to each other as a result of" Rodgard's work on Miner's "designs or other assignments." Miner agreed "to keep confidential [Rodgard's] information for five years" and to refrain from imparting the information to third parties "except to authorized [Miner] licensees outside the U.S.A." For his part, Winfield agreed to transfer to Miner "exclusive and sole rights to any invention, discovery, improvement, or innovation, existing or future, made alone or jointly with others, in connection with or related to services performed under [the 1981 contract] and specifically in connection with compression springs. "
 
 
 7
 During the time the parties worked together, Rodgard assisted Miner in installing a complete manufacturing facility for compression springs. In 1976 and 1977, they developed, fabricated, and tested several different metal plate configurations. They performed tests on Hytrel springs sandwiched between two metal plates, including a particular type of plate incorporating claw-like protrusions. During that same period, Anderson discussed the concept of "punching a hole" in the metal plate to produce a "significant tear" that would improve the strength of the bond between the plate and the Hytrel spring.
 
 
 8
 In early July 1977, Miner received several sample plate configurations from Rodgard. One of the plates had holes with "jagged edges" that resulted from punching through the metal without using a pilot hole. Concluding that the "jagged edge" holes worked well, Anderson began experimenting with that design. Anderson ultimately abandoned his efforts to use chemical means to bond the springs to the metal plates in favor of a mechanical bond that incorporated punched holes with jagged edges.
 
 
 9
 In December 1976, Anderson filed a patent application, which listed Miner as the assignee and did not list Winfield as one of the inventors. Some of the claims of that application (and a related continuation-in-part application filed in December 1977) referred to the use of pressure during the cooling phase to eliminate voids in the Hytrel springs. In March 1979, however, Anderson canceled those claims of his application that set forth the void-elimination technique. He explained to the PTO at the time that he had not invented the subject matter of those claims. The '037 patent issued on April 15, 1980. During 1978, Miner applied for, and ultimately obtained, several foreign patents. Unlike the '037 patent, however, each of the foreign patents identified the void-elimination technique as part of the claimed invention.
 
 
 10
 Rodgard filed this action in 1984, claming (1) that the court should order the correction of the '037 patent by adding Winfield as a co-inventor or (if the court found that Miner acted with deceptive intent in omitting Winfield as a co-inventor) declare the '037 patent invalid; (2) that because the '037 patent failed to disclose the best method for bonding the Hytrel springs to the metal plates, the court should declare the patent invalid as violating the best mode requirement of 35 U.S.C. § 112; and (3) that the court should grant relief against Miner on several state-law theories--misappropriation of a trade secret; breach of a confidential or fiduciary duty; breach of contract; and unjust enrichment. Miner counterclaimed, contending that Rodgard had breached its contractual obligations and seeking attorney fees pursuant to 35 U.S.C. § 285.
 
 
 11
 Following a bench trial, the district court denied Rodgard relief on all of its claims. Although it found that Miner had breached the 1977 contract, the court concluded that Rodgard had failed to prove damages as a result of that breach. The court also rejected Miner's counterclaims, denied both parties' requests for attorney fees, and awarded costs to Miner. This appeal and cross-appeal followed.
 
 DISCUSSION
 A. Joint Inventorship
 
 12
 The district court found that Rodgard failed to establish, by clear and convincing evidence, that Winfield conceived the idea of using "jagged edges" to improve the spring-plate bond. The court therefore rejected Winfield's claim of joint inventorship. Rodgard argues that the district court's finding was clearly erroneous because Winfield "suggested the use of the 'jagged edge' plate."
 
 
 13
 Although the record supports Rodgard's contention that Winfield suggested the use of "jagged edges," it does not answer the question whether Winfield conceived of that idea. The district court found that Winfield was one of five persons who may have conceived of the "jagged edges" idea, and that Rodgard failed to prove that it was Winfield who conceived of the invention. We find no error in the district court's conclusion that Rodgard failed to carry its heavy burden of proving joint inventorship by clear and convincing evidence. See Hess v. Advanced Cardiovascular Sys., Inc., No. 96-1066 (Fed.Cir. Feb. 14, 1997). We therefore affirm the district court's ruling on the joint inventorship issue.
 
 B. Best Mode
 
 14
 Rodgard sought a declaratory judgment that the '037 patent is invalid for failure to satisfy the best mode requirement of 35 U.S.C. § 112. In response, Miner argued that the district court lacked subject matter jurisdiction over the declaratory judgment claim because Miner had not charged Rodgard with infringement and there was therefore no actual controversy between the parties. The district court concluded that there was a sufficient controversy between the parties to support a request for declaratory relief, but the court denied Rodgard's claim on the merits because it found that Rodgard had failed to prove a best mode violation.
 
 
 15
 We conclude that there was not a sufficient controversy between the parties to support Rodgard's request for declaratory relief on the best mode issue and that the district court should have dismissed that claim without reaching the merits. The Declaratory Judgment Act, 28 U.S.C. § 2201(a), "requires an actual controversy between the parties before a federal court may exercise jurisdiction over an action for a declaratory judgment." EMC Corp. v. Norand Corp., 89 F.3d 807, 810, 39 USPQ2d 1451, 1453 (Fed.Cir.1996), cert. denied, 117 S.Ct. 789 (1997). To establish an actual controversy, the plaintiff must show that the patentee's conduct "created an objectively reasonable apprehension on the part of the plaintiff that the patentee will initiate suit if the activity in question continues." Id. at 811, 39 USPQ2d at 1454. Where, as here, the patentee's conduct falls short of an express charge of infringement, courts must consider the totality of the circumstances in determining whether the patentee's conduct created the requisite apprehension on the part of the plaintiff. Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 736, 6 USPQ2d 1685, 1689 (Fed.Cir.1988).
 
 
 16
 The district court relied on two factors in concluding that Rodgard reasonably feared an infringement suit by Miner. First, the court noted that "[d]uring the course of conducting business, Rodgard received notice from customers of their concern about interest in avoiding 'a patent infringement situation.' Rodgard responded to such inquiries by promising 'to intervene and to conduct the defense in any infringement suit which Miner' (or its assignee) might bring." The "actual controversy" inquiry under the Declaratory Judgment Act, however, focuses on the acts of the patentee, not those of the declaratory judgment plaintiff or its customers. The district court pointed to nothing that Miner did that could reasonably have led Rodgard or its customers to fear that Miner would institute an infringement action.
 
 
 17
 Second, the court pointed to Miner's contention at trial that Rodgard had manufactured products that "incorporated or made use of some of the concepts contained in [the '037 patent] claims." Miner's position at trial, however, does not shed any light on whether Miner's pre-suit conduct gave Rodgard reason to fear an infringement suit by Miner.
 
 
 18
 Rodgard argues that, because the district court already had jurisdiction under 35 U.S.C. § 256 to decide the joint inventorship issue, it was proper for the court to decide the best mode issue because it was "ripe for decision" and might otherwise "give rise to further litigation." The requirement of an "actual controversy," however, is a prerequisite for granting declaratory relief on a particular claim; it therefore applies to the particular claim as to which declaratory relief is sought, without regard to whether the court has jurisdiction over other claims alleged in the complaint. Because Rodgard has failed to point to anything in the record suggesting that Miner intended to assert its patent against Rodgard, there is no basis for finding an actual controversy between the parties with respect to the best mode issue. We therefore vacate the portion of the court's judgment declaring that Miner did not violate the best mode requirement of 35 U.S.C. § 112.
 
 C. Rodgard's State Law Claims
 
 19
 The district court held that Miner breached its 1977 contract with Rodgard by publicly disclosing Rodgard's void-elimination technique in the course of obtaining the '037 patent. Nonetheless, the court denied Rodgard any relief, because it ruled that Rodgard had failed to prove that it suffered any damages or that Miner was unjustly enriched as a result of the breach.
 
 
 20
 On appeal, Rodgard presents several theories of entitlement to relief based on Miner's breach of the 1977 contract. First, Rodgard argues that damages can be inferred from the disclosure of its manufacturing techniques, for which it claims trade secret status. Proof of damages, however, requires more than reliance on an inference that revelation of a trade secret normally results in financial injury. The district court ruled against Rodgard on the damages issue based on a failure of proof, a failure that was underscored by Winfield's admission that the plaintiffs had not suffered any economic harm as a result of Miner's breach. We therefore uphold the district court's ruling on Rodgard's claim of damages stemming from the disclosure of its manufacturing techniques.
 
 
 21
 Second, Rodgard argues that it was injured, and that Miner was unjustly enriched, as a result of Miner's obtaining the '037 patent by using information that Miner had promised to keep confidential. With regard to its claim for damages, Rodgard contends that Miner's ownership of the '037 patent enabled it to "freeze out" Rodgard as a competitor in the manufacture of Hytrel springs. The district court, however, found that Rodgard failed to prove that it suffered any actual damages as a result of Miner's obtaining the '037 patent. The court likewise found that Rodgard failed to prove that Miner's breach of the 1977 contract resulted in any unjust enrichment for Miner. Rodgard has not persuaded us that the district court's findings on either issue are erroneous. The district court ruled that the breach of the 1977 agreement occurred in 1980, when the issuance of the '037 patent disclosed Rodgard's void-elimination technique. Because that technique was not incorporated in any of the claims of the '037 patent, however, any benefits Miner may have obtained as a result of the patent cannot be attributed to the improper disclosure of that technique. Although the reference in the 1977 agreement to Rodgard's technology was not specifically limited to the void-elimination technique, Rodgard failed to prove that Miner improperly disclosed any other manufacturing technique in which Rodgard had a protectable interest that would support an action for an accounting or a constructive trust.
 
 
 22
 There is also no merit to Rodgard's argument that it is entitled to an accounting or a constructive trust as a result of Miner's breach of its promise not to disclose its own information regarding the Hytrel spring manufacturing process. Rodgard has not shown that it has a proprietary right in the subject property--Miner's own information--that would entitle Rodgard to an accounting or a constructive trust under New York law. See, e.g., Simonds v. Simonds, 380 N.E.2d 189, 194 (N.Y.1978); Sharp v. Kosmalski, 351 N.E.2d 721, 723 (N.Y.1976); Liberty Moving & Storage Co. v. Bay Shore Moving & Storage, Inc., 543 N.Y.S.2d 745, 746 (App.Div.1989).
 
 
 23
 We take a different view of Rodgard's final theory for recovery--its claims of damages and unjust enrichment relating to Miner's foreign patents. The district court refused to consider Rodgard's claim for recovery based on Miner's foreign patent filings because it concluded that to do so it would have to determine the validity of the foreign patents, a matter that it regarded as properly left to foreign courts.
 
 
 24
 Contrary to the district court's conclusion, entertaining Rodgard's claim for compensation in connection with the foreign patents would not require the district court to adjudicate the co-inventorship issue with respect to those patents. Rodgard's claim depends on the terms of the parties' contracts, not on the identity of the inventor of the subject matter of the foreign patents.
 
 
 25
 As Rodgard points out, the district court erred in concluding that the parties' three contracts "all contained provisions whereby Miner could disclose information abroad and outside the domestic marketplace, notwithstanding any potential detriment to Rodgard." Although the 1976 contract was silent on the issue of foreign disclosure, the 1977 contract restricted disclosure abroad by providing that Miner could divulge the information abroad to its "authorized licensees" and "on a confidential basis," subject to other terms and conditions in the contract. Similarly, the 1981 contract provided that Miner could disclose Rodgard's information abroad only to Miner's authorized licensees.
 
 
 26
 Absent a finding by the district court that Miner complied with the restrictions of the 1977 and 1981 contracts, the court's conclusion that the parties' contracts permitted Miner to disclose information abroad cannot stand. We therefore remand to the district court so that Rodgard may have an opportunity to conduct discovery and attempt to demonstrate a basis for some form of recovery premised on Miner's disclosures in its foreign patents, in violation of its obligations under the 1977 and 1981 contracts.
 
 
 27
 Finally, while we find no error in the district court's analysis of Rodgard's request for punitive damages, we note that the district court may reconsider the issue of enhanced damages if, on remand, it determines that Rodgard is entitled to some form of recovery against Miner.
 
 D. Costs
 
 28
 The district court awarded costs to Miner as the prevailing party. Rodgard alleges error in that award, pointing out that Miner did not prevail on its counterclaim. Because Miner was the prevailing party with respect to the main issues in dispute before the district court, the order of costs was justified based on the state of the record at the time the court entered its judgment. As we are remanding the case to the district court for further proceedings, however, we vacate the award of costs to Miner. On remand, the district court may revisit the award of costs after it has adjudicated all of the remaining issues in the case.
 
 E. Miner's Cross-Appeal
 
 29
 In its cross-appeal, Miner seeks attorney fees, claiming that Rodgard's case "clearly fall[s] on the side of frivolous." We disagree. The district court found that Rodgard litigated the case "vigorously and properly and in total good faith, and certainly based upon reasonable inquiries." Moreover, in light of our decision to vacate the judgment in part, it is clear that we do not share Miner's view of Rodgard's case as frivolous. We therefore uphold the district court's order denying Miner's request for attorney fees.
 
 
 30
 Each party shall bear its own costs for this appeal.
 
 
 31
 AFFIRMED-IN-PART, VACATED-IN-PART, and REMANDED.