FRESENIUS USA, INC., a Massachusetts corporation, Plaintiff,

v.

TRANSONIC SYSTEMS, INC., a New York corporation, Defendant.

No. C 01–02617 WHA.

United States District Court,
N.D. California.

Aug. 31, 2001.

A. James Isbester, Gibson, Dunn & Crutcher LLP, San Francisco, CA, Monique Michal Drake, Gibson Dunn & Crutcher LLP, Denver, CO, for Plaintiff.

Karen Vogel Weil, Michael K. Friedland, Irfan A. Lateef, Knobbe Martens Olson &

Bear LLP, Los Angeles and Newport Beach, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT–MATTER JURISDICTION; VACATING HEARING

ALSUP, District Judge.

### INTRODUCTION

In this patent-infringement case, this order **GRANTS** defendant's motion to dismiss for lack of subject-matter jurisdiction. The hearing is **VACATED**.

### STATEMENT

Plaintiff Fresenius USA, Inc. ("FUSA") operates dialysis clinics. Defendant Transonic Systems, Inc. is the owner of the patent-in-suit, United States Patent No. 5,685,989. The '989 patent is directed to a method and device used to measure access blood flow, which is the amount of blood flowing through an artificial vessel that is implanted in patients undergoing kidney dialysis.

On March 21, 2001, counsel for Transonic sent a letter to FUSA. It stated: "We represent Transonic Systems, Inc. ("Transonic") of Ithica, New York, in matters regarding enforcement of the above-referenced patent" (Friedland Decl., Exh. A, at 1). The letter noted that Transonic had sued a different company, In–Line Diagnostics in Utah, and that the court in Utah had construed the claims of the '989 patent broadly (*ibid.*). The letter stated: "It has recently come to our attention that Fresenius is now taking active steps to market a conductivity dialysance method for measuring access blood flow.... It is our further understanding that this method is described in an article recently published by Dr. Frank Gotch.... Based on the claims construction adopted [by] the District Court, this method infringes the '989

patent" (*ibid.*). It further asserted that (*id.* at 2):

it is our understanding that a number of Fresenius Medical Care clinics may be using the Crit–Line hematocrit monitor manufactured by ILD to perform blood flow measurements. The claims construction adopted by the Court clearly encompasses the reversed line methods for measuring access blood flow using the Crit–Line monitor promoted by ILD. Thus, Fresenius may be liable for patent infringement if it is using or has used the Crit–Line monitors to measure access blood flow in its clinics.

Moreover, you should be aware that, in connection with this ongoing lawsuit against ILD, the Court has recently issued a preliminary injunction against ILD. The Court order preliminarily enjoins ILD from, *inter alia*, selling, giving away, loaning or promoting, for use in the United States, the Crit–Line III monitor, or any other monitor, which contains software for automatically calculating access blood flow using the "Delta H" method. We have included the Court's preliminary injunction opinion and order for your information. Please be advised that if any Fresenius Medical Care clinics are using the Crit–Line III monitor to measure access blood flow in accordance with the enjoined method, Fresenius may be in contempt of court, or at a minimum, would be infringing the patent.

Transonic desires to resolve all the infringement issues discussed above quickly and amicably. Therefore, please review the enclosed materials and contact me within two weeks to discuss possible resolutions to these outstanding infringement issues.

A copy of the Utah court's claim-construction order was included with the letter.

Two weeks later, on April 4, FUSA filed the instant action, seeking a declaratory judgment for non-infringement and invalidity of the '989 patent. Two days after filing the complaint, FUSA responded to

Transonic's letter, stating that FUSA did not own every Fresenius clinic, but that the clinics related to FUSA did not use the ILD system in a way that infringed the '989 patent (Friedland Decl., Exh. B at 1). It further stated that the method disclosed by Dr. Gotch did not include "several important limitations of each of the claims of the patent" (*id.* at ·2). Transonic's counsel responded to FUSA's letter on April 18, stating "We would appreciate your advising us how, in fact, the Fresenius clinics are using the Crit–Line monitors to measure access blood flow" (Friedland Decl., Exh. C at 1). Transonic's letter elaborated on the reasons that the method disclosed by Dr. Gotch allegedly infringed. It ended: "Based upon this clear infringement by Fresenius of the '989 patent, it is in everybody's best interest to resolve this matter amicably. If we have not made substantial progress toward amicably resolving this mater [sic] by April 27, our client will consider its other options" (*id.* at 2). On April 27, FUSA responded to Transonic's letter, disputing infringement, and indicating that the instant complaint would be served on Transonic (Friedland Decl., Exh. D). The parties subsequently engaged in settlement negotiations, at which time FUSA offered to dismiss its complaint if Transonic would agree that it could only sue FUSA in the Northern District of California (Friedland Decl., Exh. E). This offer was declined.

## ANALYSIS

Transonic argues that there was no jurisdiction over FUSA's complaint at the time it was filed because there was not an actual controversy. Alternately, it requests the Court to decline to exercise jurisdiction, since whether to address a claim for declaratory relief is discretionary. Under the Declaratory Judgment Act, 28 U.S.C. 2201, a court may assert jurisdiction over any "actual controversy."

*Aetna Life Ins. v. Haworth,* 300 U.S. 227, 239–41, 57 S.Ct. 461, 81 L.Ed. 617 (1937).

 In patent cases, Federal Circuit law governs the question of whether there is an actual controversy. *Goodyear Tire & Rubber Co. v. Releasomers, Inc.,* 824 F.2d 953, 955 n. 3 (Fed.Cir.1987). In general, the presence of an "actual controversy" depends on "whether the facts alleged, under all circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *EMC Corp. v. Norand Corp.,* 89 F.3d 807, 810 (Fed.Cir.1996) (quotations omitted).

 There is a two-part test for the existence of an actual controversy: "First, the plaintiff must produce or be prepared to produce an allegedly infringing product. Second, the patentee's conduct must have created an objectively reasonable apprehension on the part of the plaintiff that the patentee will initiate suit if the activity in question continues." *Id.* at 811. A mere offer of a license, without more, is insufficient to create a reasonable apprehension. *Ibid.* A reasonable apprehension of suit does not require an explicit "charge of infringement and threat of suit; rather, such apprehension may be induced by subtler conduct if that conduct rises to a level sufficient to indicate an intent on the part of the patentee to enforce its patent, *i.e.,* to initiate an infringement action." *Ibid.* (quotations and brackets omitted).

 The single letter from Transonic was insufficient to create an actual controversy. The letter was the first communication between the parties regarding the activities at issue. It sought to open negotiations for a resolution without litigation. "When there are proposed or ongoing license negotiations, a litigation controversy normally does not arise until the negotia-

tions have broken down." *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha,* 57 F.3d 1051, 1053–54 (Fed.Cir. 1995). The letter offered to "resolve all the infringement issues discussed above quickly and amicably" and to "discuss possible resolutions" of the dispute (Friedland Decl., Exh. A, at 2). This was an offer to negotiate. Significantly, FUSA did not even respond to this offer before filing suit.

FUSA argues that the following facts led to an objectively reasonable fear of litigation. The letter did not explicitly use the word "license." The letter was from "enforcement" counsel. The letter suggested that FUSA had already infringed, was currently infringing, and was going to infringe if it marketed the product that Dr. Gotch discussed. And finally, the letter contained extensive discussion of the lawsuit Transonic brought in Utah to enforce the same patent-in-suit here. In light of Transonic's offer to discuss resolution of the dispute, these statements do not create an imminent threat of litigation.

> To be sure, any time parties are in negotiation over patent rights, the possibility of a lawsuit looms in the background. No patent owner with any sense would open negotiations by assuring his opposite party that he does not intend to enforce his patent rights under any circumstances. The threat of enforcement—either directly by the patentee or indirectly by a third party to whom the patentee licenses or sells the patent—is the entire source of the patentee's bargaining power.

*EMC,* 89 F.3d at 811. The letter stated that Transonic wanted to discuss possible resolution of the issues. That it did not use the term "license" is immaterial. No decision has required any specific language for an offer to negotiate. Contrary to FUSA's argument, that the letter indicated that a method that FUSA was taking

steps to market infringed the claim construction given by a court in Utah does not automatically establish an actual controversy. "In the end, the question is whether the relationship between the parties can be considered a 'controversy,' and that inquiry does not turn on whether the parties have used particular magic words in communicating with one another." *EMC,* 89 F.3d at 812. Here, there was an offer to negotiate on the table. There was also an underlying threat that Transonic would litigate if negotiations failed, as it had done in Utah. Based on the letter alone, it was objectively unreasonable to fear imminent suit, since negotiations had not even begun, much less failed.

Moreover, even if an actually controversy existed, the Court would decline to exercise jurisdiction. "Even if there is an actual controversy, the district court is not required to exercise declaratory judgment jurisdiction, but has discretion to decline that jurisdiction." *Id.* at 810 (citing *Public Serv. Comm'n v. Wycoff, Co.,* 344 U.S. 237, 241, 73 S.Ct. 236, 97 L.Ed. 291 (1952)). The Declaratory Judgment Act provides an accused infringer with the right to seek relief where the patentee has "refused to grasp the nettle and sue," leaving the accused infringer with an *"in terrorem* choice between the incurrence of a growing potential liability for patent infringement and abandonment of [its] enterprises." *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 734 (Fed.Cir.1988). At the time it filed suit, FUSA was not yet faced with any such dilemma since this was the first communication from Transonic, and there was an outstanding offer to negotiate. There is no evidence that Transonic in any way delayed or intended to avoid filing suit if an amicable resolution could not be achieved. Exercising jurisdiction over declaratory-relief actions under such circumstances would create a strong disincentive

for patentees to communicate with potential infringers before filing suit, for fear of being sued first and thus forced to litigate in the defendant's forum of choice.

## CONCLUSION

For the foregoing reasons, defendant Transonic's motion to dismiss for lack of subject-matter jurisdiction is **GRANTED**. The hearing is **VACATED**. The Clerk shall close the file.

**IT IS SO ORDERED.**