The **CHARLES MACHINE WORKS, INC., Plaintiff,**

v.

**DIGITAL CONTROL INCORPORATED, Defendant.**

No. CIV–02–1426–T.

United States District Court, W.D. Oklahoma.

April 21, 2003.

Robert Tomlinson, Esq., McKinney & Stringer, P.C., Oklahoma City, OK, for plaintiff.

Paul T. Meiklejohn, WSBA No. 17477, Brian C. Park, WSBA No. 25584, Dorsey & Whitney, LLP, Seattle, WA, Aaron Keyt, WSBA No. 19441, Digital Control Incorporated, Renton, WA, for defendant.

## ORDER

RALPH G. THOMPSON, District Judge.

Before the Court is Defendant's Motion to Dismiss Plaintiff's Declaratory Judgment Action, filed under Fed.R.Civ.P. 12(b)(1) on February 10, 2003. Defendant challenges the existence of subject matter jurisdiction and, specifically, whether the "actual controversy" requirement of the Declaratory Judgment Act, 28 U.S.C. § 2201(a), has been met. Defendant alternatively asks the Court to exercise its discretion under the Act to decline jurisdiction. Plaintiff has timely opposed the motion, and defendant has replied. For reasons that follow, the Court grants defendant's motion and dismisses the case.

The complaint in this case seeks a declaration of patent invalidity or noninfringement. Charles Machine Works, Inc. (CMW) claims that Digital Control Incorporated (DCI) holds twelve enumerated U.S. patents "relating to the use of horizontal directional drilling (HDD) trackers, locators and transmitters" and that CMW designs, manufactures, and sells such products. (Compl. at 2–3, ¶¶ 4–5.) DCI does not dispute these facts but instead challenges allegations made by CMW to show the existence of an actual, justiciable controversy between the parties at the time of suit. With its motion for dismissal, DCI has submitted declarations of its witnesses and relevant documents. CMW has responded in kind with affidavits and documentary evidence. The parties' submissions will be discussed further below to the extent they are pertinent to the Court's analysis.

## STANDARD OF DECISION [1]

Under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), a federal court may exercise jurisdiction over a declaratory judgment action only when there is an actual controversy between the parties. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–41, 57 S.Ct. 461, 81 L.Ed. 617 (1937); *Joslin v. Secretary of Dept. of Treasury*, 832 F.2d 132, 134 (10th Cir. 1987). "In general, the presence of an 'actual controversy' within the meaning of the statute depends on 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 810 (Fed.Cir.1996) (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826, (1941)); *see Joslin*, 832 F.2d at 135 (same).

Here, the complaint alleges that threats of litigation made by DCI's representatives to CMW's customers and competitors, together with DCI's history of initiating infringement litigation against others, led CMW reasonably to fear "that DCI will bring an infringement action against CMW in the near future." (Compl. at 4, ¶ 10.) DCI's motion and evidence challenge this averment and the factual allegations on which it is based. In this situation, where a party raises a factual question concern-

---

**1.** On matters unique to patent law, the Court must follow case law of the Federal Circuit, but on general or procedural matters, regional circuit law controls. *See Tronzo v. Biomet, Inc.*, 318 F.3d 1378, 1381 (Fed.Cir.2003); *Transmatic v. Gulton Indus., Inc.*, 180 F.3d 1343, 1347 (Fed.Cir.1999); *see also Vanguard Research, Inc. v. Peat, Inc.*, 304 F.3d 1249, 1254 (Fed.Cir.2002).

ing subject matter jurisdiction, " 'a district court may not presume the truthfulness of the complaint's factual allegations.' " *Sizova v. National Inst. of Standards & Tech.*, 282 F.3d 1320, 1324 (10th Cir.2002) (quoting *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir.1995)); *Stuart v. Colorado Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir.2001) (same). Instead, the party invoking the court's jurisdiction bears the burden to come forward with competent proof and to show by a preponderance of the evidence that jurisdiction exists. *United States ex rel Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 797–98 (10th Cir.2002); *United States ex rel. King v. Hillcrest Health Ctr., Inc.*, 264 F.3d 1271, 1278 (10th Cir.2001); *see Thomson v. Gaskill*, 315 U.S. 442, 446, 62 S.Ct. 673, 86 L.Ed. 951 (1942); *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135, (1936).

" 'A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).' " *Sizova*, 282 at 1324 (quoting *Holt*, 46 F.3d at 1003); *Stuart*, 271 F.3d at 1225 (same). Neither party in this case requests an evidentiary hearing. Both instead choose to litigate the factual issue of jurisdiction with affidavits and other papers. The Court thus will decide the issue on the basis of the parties' documentary submissions.[2]

## ANALYSIS

### A. Patent Law Defining "Actual Controversy"

For an actual controversy to exist in a patent case, " '[t]here must be both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.' " *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 855 (Fed.Cir. 1999) (quoting *BP Chem. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978 (Fed.Cir. 1993)). The first element, which alone is disputed here, requires that "the patentee's conduct must have created an objectively reasonable apprehension on the part of the plaintiff that the patentee will initiate suit if the activity in question continues." *EMC*, 89 F.3d at 811. "To put a putative infringer in reasonable apprehension of suit does not require an express charge of infringement and threat of suit; rather, such apprehension may be induced by subtler conduct if that conduct rises 'to a level sufficient to indicate an intent [on the part of the patentee] to enforce its patent,' i.e., to initiate an infringement action." *Id.* (quoting *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 887 (Fed.Cir.1992)). The test is an objective one that applies to facts in existence when the complaint was filed. *West Interactive Corp. v. First Data Res., Inc.*, 972 F.2d 1295, 1297 (Fed.Cir. 1992); *Indium Corp. v. Semi–Alloys, Inc.*, 781 F.2d 879, 883 (Fed.Cir.1985). Thus the question presented is whether DCI's conduct placed CMW in objectively reasonable apprehension on October 11, 2002, that it would be sued for infringing DCI's patents.

### B. Plaintiff's Jurisdictional Facts and Evidence[3]

---

**2.** Defendant does request oral argument on its motion based on a belief that argument would "be helpful for the Court to understand the somewhat complicated factual background for the issues discussed in the motion." (Def.'s Mot. Dismiss at 1.) The Court finds the parties' briefs to be adequate for this purpose, however; no oral argument is needed.

**3.** The facts recited here are ones that have evidentiary support. CMW presents a narra-

In December of 1997, CMW received a telephone call from DCI's founder and CEO, John Mercer, inquiring into CMW's interest in licensing one patent in issue, No. 5,633,589 ('589). (Atkins Aff. at 2, ¶ 2.) Soon afterward, CMW received a letter from Dr. Mercer confirming the telephone conversation and stating in part: "We are approaching all drillhead manufacturers in order to fairly enforce our intellectual property." (Pl.'s Resp. Def.'s Mot. Dismiss, Ex. B.) CMW responded by letter in August, 1998, stating its position that the '589 patent is invalid. (Pl.'s Resp. Def.'s Mot. Dismiss, Ex. C.)

In July of 1998, DCI filed a patent infringement suit against Lexikon Technologies Corporation concerning another patent in issue, No. 5,767,678 ('678): *Digital Control Inc. v. Lexikon Tech. Corp.,* Case No. C98–0959WD (W.D.Wash.). The complaint in that case alleged that Lexikon had induced its customers to infringe the '678 patent through the use and sale of systems for monitoring the location of boring tools. (Pl.'s Resp. Def.'s Mot. Dismiss, Ex. D at 2–3.)

The following year, in June of 1999, DCI filed another infringement action concerning both the '589 and '678 patents: *Digital Control Inc. v. Radiodetection Corp.,* Case No. C99–1016L (W.D.Wash.).[4] DCI alleged that Radiodetection was manufacturing and selling underground locating systems that infringed DCI's patents. (Pl.'s Resp. Def.'s Mot. Dismiss, Ex. E at 3.) This lawsuit was settled, and a published report about the settlement appeared in an industry magazine in August, 2001. According to the publication, Radiodetection acknowledged in the settlement the validity of eight DCI patents and agreed to pay damages and future royalties. (Pl.'s Resp. Def.'s Mot. Dismiss, Ex. H.)

On January 1, 2001, DCI again sued a company for infringement: *Digital Control Inc. v. Boretronics, Inc.,* 161 F.Supp.2d 1183 (W.D.Wash.2001). The case involved eleven patents, most of which were issued after commencement of the *Radiodetection* case. DCI claimed that Boretronics was infringing these patents by manufacturing and selling HDD transmitters and related products, and was inducing others to infringe the patents. (Pl.'s Resp. Def.'s Mot. Dismiss, Ex. F.)

In June of 2001, DCI brought suit against a company that, like CMW, manufactures HDD systems: *Digital Control, Inc. v. McLaughlin Mfg. Co.,* Case No. C01–0985P (W.D.Wash.). The case concerned all twelve patents in issue here and involved claims that McLaughlin was manufacturing and selling HDD locators, trackers, and related products that infringe DCI's patents. (Pl.'s Resp. Def.'s Mot. Dismiss, Ex. G at 4–6.) In CMW's view, the *McLaughlin* case manifests DCI's plan to enforce its intellectual property rights against all users of HDD technology by systematically suing them all for patent infringement. Plaintiff claims that others in the HDD industry reached this same conclusion and, like CMW, believed that CMW would be sued next. To support this claim, CMW relies on conversations that reportedly occurred during an industry trade show in January 2002.

CMW presents the affidavit of its representative at the show, Corey Potter, who testifies that he had two conversations that led him to the conclusions expressed above. First, Mr. Potter states that he

---

tive of alleged facts in its brief, but not all of its statements are substantiated by exhibits. Unsupported allegations and argument are ignored.

4. The statement in plaintiff's brief that the suit against Radiodetection involved nine patents is not supported by the proffered copy of the complaint. (Pl.'s Resp. Def.'s Mot. Dismiss, Ex. E.)

talked with McLaughlin's president, Dave Gasmovic, about the *McLaughlin* case. Mr. Gasmovic allegedly told Mr. Potter that "DCI intended to sue all its competitors in the HDD industry" and that DCI would "work its way up to the competitor with the largest market share—CMW." (Potter Aff. at 2, ¶ 4.) Second, Mr. Potter states that he spoke with Kevin Alft, who is vice president of another competitor that sells HDD technology, Vermeer Manufacturing, Inc. "Mr. Alft warned [Mr. Potter] that DCI planned to sue CMW for infringement" and "that CMW was the next focal point of DCI's litigation." (Potter Aff. at 2, ¶ 6.) Mr. Potter reports that he was told at the show about DCI's suits against "smaller competitors in the HDD industry, Boretronics and Lexicon [sic]" and he was aware that DCI had sued Radiodetection before suing McLaughlin. (Potter Aff. at 2, ¶ 7.)

The nature of Mr. Alft's "warning" to Mr. Potter is clarified by an affidavit from Mr. Alft himself.[5] Mr. Alft testifies that he spoke generally with Mr. Potter during the January 2002 trade show and expressed a belief "that CMW would be a likely candidate for a similar infringement suit by DCI after the litigation with McLaughlin was finished." (Alft Aff. at 1–2, ¶ 3.) He explains the basis of his opinion to be "speculation based on publicly available information regarding DCI's litigation with Radiodetection and McLaughlin" and not based on any statement by DCI to that effect. (Alft Aff. at 2, ¶¶ 3–4.)

CMW also presents an affidavit of another employee, Scott Pollman, who testifies about statements made "[s]ometime

between February, 2002, and May, 2002," by a representative of Utilx Corporation, George Taylor. According to Mr. Pollman, Mr. Taylor reported conversations he had with DCI representatives in September, 2001, during a dinner meeting to discuss patent issues between Utilx and DCI. Mr. Taylor said, as related by Mr. Pollman, that "Dr. Mercer mentioned DCI's plan to sue CMW," and that Dr. Mercer said "DCI was going to sue, or 'destroy' CMW like they were 'destroying' the other manufacturers, Radiodetection and McLaughlin . . . ." (Pollman Aff. at 2, ¶¶ 3–4.) Mr. Pollman also testifies about a meeting with DCI representatives on May 1, 2002, and subsequent telephone contacts in which he attempted to initiate discussions about CMW's licensing DCI's technology. As of October 11, 2002, several attempts to reach Dr. Mercer had failed.[6]

Dr. Mercer denies the statements attributed to him by Mr. Taylor. He testifies under oath that he "never discussed DCI's intellectual property as it might relate to CMW or CMW's products with anyone at Utilx" and "never threatened a future civil action against CMW or Utilx for infringement of DCI's patents in any conversation or communication with anyone from Utilx or CMW." (Mercer Decl. Supp. Def.'s Mot. Dismiss at 2, ¶ 5.) DCI provides similar testimony of Peter Hambling, another representative who allegedly attended the dinner meeting with representatives of Utilx. (Hambling Decl. at 1, ¶ 4.)

In addition to the secondhand report of an alleged threat by Dr. Mercer, CMW presents a copy of a declaration that Dr. Mercer provided in the *McLaughlin* case.

---

**5.** Although DCI submitted the affidavit (Def.'s Mot. Dismiss, Alft Aff.), CMW utilizes it to support jurisdiction. (Pl.'s Resp. Def.'s Mot. Dismiss, at 5 & Ex. J.)

**6.** Mr. Pollman and Dr. Mercer finally spoke on October 14, 2002, a few days after this lawsuit was filed. Dr. Mercer directed Mr.

Pollman's licensing inquiry to DCI's general counsel, Aaron Keyt, who worked with Mr. Pollman to reach a negotiation agreement and to arrange a meeting. Licensing negotiations began in December 2002, but ceased when DCI learned of this lawsuit. (Pollman Aff. at 3–5, ¶¶ 12–19; Keyt Decl. at 1–4, ¶¶ 2–10.)

In it he testifies about the HDD industry and states: "There are only four companies, including the two parties to this litigation, whose HDD locating equipment is sold in the United States." (Mercer Decl. at 2, ¶ 6.) He identifies another one of the four companies as Radiodetection. CMW contends that although Dr. Mercer did not name the fourth company, he clearly was referring to CMW and was expressing DCI's position that CMW infringed its patents.

The final prelitigation event cited by CMW to show a reasonable apprehension of suit also comes from the *McLaughlin* case. CMW presents evidence that on October 2, 2002, it became a target of deposition and document subpoenas issued in that case by McLaughlin. The subpoenas sought discovery of information concerning CMW's technology and patented inventions. Understandably concerned about the sensitive nature of this information, CMW's counsel sought to negotiate an agreement that would give CMW access to confidential discovery materials produced in the case by McLaughlin and DCI, particularly Dr. Mercer's deposition. CMW expressed a desire for informational parity because "[i]f DCI's past practice is repeated or industry rumors that CMW is the next lawsuit defendant prove true, it is very likely that the documents and deposition testimony of [CMW's deponents] will ultimately be used in litigation between DCI and CMW." (Pl.'s Resp. Def.'s Mot. Dismiss, Ex. M at 2.) After an exchange of communications among attorneys for the three companies, McLaughlin cancelled its discovery requests to CMW on October 10, 2002. DCI then issued its own subpoenas on October 11, 2002. CMW filed this lawsuit the same day.

C. *Application of Legal Principles to Plaintiff's Presentation of Evidence*

■ CMW claims to have established that "looking at the totality of circum-stances, [DCI's] activities were such that [CMW] was placed in reasonable apprehension of suit for patent infringement" as of October 11, 2002. *Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 955 (Fed.Cir.1987); *see Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 888 (Fed. Cir.1992) (absent an express charge of infringement, courts look to the "totality of the circumstances"). CMW argues that the facts and circumstances here are analogous to those in *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731 (Fed.Cir.1988), where jurisdiction was found. The Court is not persuaded.

The facts in *Arrowhead* are far different from the ones here and gave the alleged infringer in that case much stronger reason to fear suit. The parties in *Arrowhead* were two competitors in the business of providing water treatment services. The defendant held a patent for a deoxygenation process and, soon after the patent was issued, brought suit against a third party for infringement. When the plaintiff obtained a customer's purchase order for deoxygenation services, the defendant (who was vying for the same customer's business) sent a letter to the customer claiming that the plaintiff, and the customer if it used the plaintiff's services, would be infringing the defendant's patent. As a result of this letter, the customer demanded an indemnity agreement from the plaintiff before going forward with the purchaser order. The defendant's attorney also sent a letter to the plaintiff demanding that it cease the unauthorized "practice of the patented process" and concluding with a statement that the defendant had "in the past not hesitated to protect its patent rights whenever appropriate." *Id.* at 733. When asked what the concluding statement meant, the defendant's attorney said it referred "to federal patent infringement litigation brought by our client in respect to its patents." *Id.* Finally, the defendant

submitted a pleading in its infringement action against the third party proposing that the court find infringement by both the third party and Arrowhead. *Id.* at 734.

Based on these numerous acts by the defendant in *Arrowhead*, the court found that the plaintiff had a reasonable apprehension of suit. *Id.* at 737. The court specifically relied on: (1) the defendant's letter to the customer that was sufficiently threatening to cause it to demand indemnification; (2) communications directly to the plaintiff expressly stating an intention to enforce the defendant's patent rights by litigation; (3) the defendant's litigation against a third party that "evidenced not only an intent but a willingness and capacity to employ litigation in pursuit of its patent rights;" and (4) the defendant's submission of a proposed finding in its infringement action seeking a determination that Arrowhead was an infringer. *Id.* In contrast, the only one of these circumstances present here is DCI's lawsuits against others, which evince a practice of enforcing its patent rights through litigation against alleged infringers. CMW has not come forward with sufficient evidence, however, to demonstrate that DCI had formed an intent to sue CMW or even a belief that CMW is an infringer.

The only direct communications between the parties in this case concerning patent issues occurred in 1997 and 1998. Those communications provided no basis for CMW to fear litigation by DCI in 2002, both because of their remoteness in time and because nothing that DCI said suggested an intent to pursue patent infringement litigation. Dr. Mercer's letter stated only that DCI would "fairly enforce its intellectual property." (Pl.'s Resp. Def.'s Mot. Dismiss, Ex. B.) "Enforcement" is not synonymous with "litigation." The statement must be read in context of the remainder of the letter, which merely con-tained an offer to license DCI's "patent relating to the use of slots in drillheads" and stated that DCI was "approaching all drillhead manufacturers," apparently for this purpose. Dr. Mercer expressly stated that DCI "would prefer to resolve this issue without directly involving attorneys" and that its goal was "to negotiate a licensing agreement." (Pl.'s Resp. Def.'s Mot. Dismiss, Ex. B.) An offer of a license does not necessarily imply a claim of infringement. *See Indium Corp. v. Semi–Alloys, Inc.,* 781 F.2d 879, 883 (Fed.Cir.1985). Nothing about Dr. Mercer's letter indicates the assertion of such a claim. Moreover, DCI's termination of the discussion once CMW took the position that the asserted patent is invalid suggests that DCI did not wish to litigate the issue with CMW.

Similarly, Dr. Mercer's declaration in the *McLaughlin* case has no bearing on the Court's analysis for three reasons: First, although the document bears a file-stamp of the federal court clerk in the Western District of Washington dated February 7, 2002, CMW provides no evidence that it saw the document or knew its contents before October 11, 2002. Second, there are no facts in this record from which to infer that Dr. Mercer was speaking about CMW. The allegation that his declaration implicates CMW appears only in plaintiff's brief without any citation to record evidence. (Pl.'s Resp. Def.'s Mot. Dismiss at 6 ("There is only one other manufacturer of HDD locating equipment implicated by DCI's patent—CMW.").) Third, assuming the truth of this allegation, there is nothing in the remainder of Dr. Mercer's declaration to suggest a claim that CMW or any of its products is infringing DCI's patents. His testimony concerning technical issues speaks only of McLaughlin and its products. The case law is clear that mere possession of an adverse patent is not enough. "[F]or an actual controversy more is required than

the existence of an adversely held patent." *BP Chem. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978 (Fed.Cir.1993). Therefore, Dr. Mercer's declaration does not support jurisdiction.

CMW relies most heavily on statements to its employees by persons involved in the HDD industry who were not representatives of DCI. Objectively reasonable apprehension must be based on DCI's conduct, and not merely on industry assumptions or speculation. Thus the source of CMW's information is critical to the Court's analysis of this evidence. On this point, case authority cited by DCI is helpful.

In *West Interactive Corp. v. First Data Res., Inc.*, 972 F.2d 1295, 1297 (Fed.Cir. 1992), the court found insufficient evidence of conduct by the patentee to create in the plaintiff a reasonable apprehension of suit, despite third party statements and a history of litigation against others. The plaintiff in *West* received a report from a third party of oral statements by the inventor on the patents that both the plaintiff and the third party had infringed the patents and that infringement would lead to legal problems. The court reasoned that at the time the statements were made, the inventor was working for and representing a licensee of the patent; he "was not an owner, officer, agent, or even an employee" of the patentee. *Id.* The court found no evidence in the record to justify attributing the licensee's conduct to the patentee. The court further noted that the comments occurred in the context of negotiations; the setting and the vagueness of the licensee's statements indicated that they were mere

"jawboning" rather than threats of litigation. *Id.* at 1298. Further, the patentee's suits against unrelated third parties were pertinent but not conclusive and did not give the plaintiff a reason to fear litigation. *Id.*

In this case, oral statements that CMW received from representatives of McLaughlin and Vermeer provided no basis for CMW reasonably to apprehend a lawsuit by DCI. These statements—that DCI likely would sue CMW—were not attributable to DCI and were not based on any conduct by DCI other than its lawsuits against unrelated third parties. The fact that DCI had previously filed lawsuits, by itself, was insufficient to suggest a future lawsuit against CMW. If the conclusions reached by McLaughlin and Vermeer were based on something more than DCI's previous lawsuits, that "something more" is not evident from the existing record.

The statement to CMW by a representative of Utilx stands on different footing. It was based on an alleged conversation with representatives of DCI and included a statement by an officer, Dr. Mercer, that DCI planned to sue CMW. This threat, if it occurred, might create in CMW a reasonable apprehension of suit, even though it was not made directly to CMW.[7] The difficulty here is that CMW has not presented competent proof of the alleged threat. It appears in this record only through testimony by CMW's employee, Mr. Pollman, about what Mr. Taylor said that Dr. Mercer said. DCI objects to Mr. Pollman's testimony on hearsay grounds, and CMW has provided no legal basis for admissibility.[8] CMW argues that the

---

7. CMW argues in its brief that the threat was made to one of its customers. There is no record evidence, however, that Utilx was a customer or prospective customer of CMW.

8. CMW contends, without authority, that Dr. Mercer's statement is an admission against

interest and so falls within an exception to the hearsay rule. (Pl.'s Resp. Def.'s Mot. Dismiss at 15.) However, CMW presents only a secondhand report of Dr. Mercer's statement; it does not cite a hearsay exception that would apply to the alleged out-of-court statement by Mr. Taylor.

point of this testimony is not the truth of the threat but whether its receipt by CMW provided a reasonable basis to fear suit. (Pl.'s Resp. Def.'s Mot. Dismiss at 12–13 (citing *Ion Beam Applications S.A. v. Titan Corp.*, 156 F.Supp.2d 552, 558 (E.D.Va. 2000).)) This argument is persuasive and supported by case law, *see West,* 972 F.2d at 1298, but it is misguided here. It assumes the existence of a critical fact that is missing from this case, namely, admissible evidence that a threat occurred. The person who allegedly heard the threat, Mr. Taylor, has not come forward to testify.[9] CMW has not provided a sufficient basis to evaluate the context or the substance of Dr. Mercer's alleged statements. As noted by the court in *West,* a statement made during licensing negotiations might be a threat of litigation or mere "jawboning." In short, CMW has failed to substantiate its allegation that DCI made a threat of suit against it to an alleged customer.

Finally, the Court finds in the last alleged precipitating event—DCI's issuance of subpoenas to CMW in the *McLaughlin* case—insufficient reason for an apprehension of suit. CMW was targeted for discovery by McLaughlin; DCI simply followed McLaughlin's lead. It is unclear how any information possessed by CMW might be relevant to the issues in the *McLaughlin* case. CMW presents no evidence that its technology or products have ever been mentioned in that case, other than in the subpoenas. Understandably, however, DCI would want to insure that, if McLaughlin correctly believed that CMW had relevant information, then DCI would have equal access to the information.[10] Nothing in this record indicates that DCI had any interest in CMW's technology apart from its litigation against McLaughlin.

In summary, the Court has no doubt that CMW had a real apprehension of suit. Its counsel specifically mentioned this concern in correspondence regarding the *McLaughlin* case. CMW has not met its burden, however, of showing that its apprehension was objectively reasonable under the circumstances. None of the facts shown by the record, nor all of them added together, is sufficient to establish a reasonable belief by CMW that DCI intended to initiate a patent infringement suit against it. Under the evidence presented, CMW has failed to prove the existence of an actual controversy between itself and DCI at the time this action was filed. Therefore, the Court lacks subject matter jurisdiction.

D. *The Court's Discretion to Decline Jurisdiction*

■ In addition to a lack of subject matter jurisdiction, the Court concludes that it would not entertain CMW's declaratory judgment action even in the presence of jurisdiction. The Declaratory Judgment Act empowers federal courts to hear declaratory judgment actions but does not oblige them to do so; whether to entertain a justiciable declaratory judgment action is a question committed to the sound discretion of district courts. *Wilton v. Seven Falls Co.,* 515 U.S. 277, 288–89, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). "[T]he propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power." *Id.* at 287, 115 S.Ct. 2137 (quoting *Public*

---

9. The only other named participants in the conversation, Dr. Mercer and Mr. Hambling, deny ever meeting with Mr. Taylor.

10. DCI contends that McLaughlin's abrupt decision to cancel its subpoenas caused DCI to suspect that CMW had agreed voluntarily to provide information to McLaughlin, and DCI only wanted to preserve its right of access to the same information.

*Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 243, 73 S.Ct. 236, 97 L.Ed. 291 (1952)).

To guide district courts in exercising their broad discretion, the Tenth Circuit has identified relevant factors for consideration:

> (1) whether a declaratory action would settle the controversy; (2) whether it would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race to *res judicata*"; (4) whether use of a declaratory judgment action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*St. Paul Fire & Marine Ins. Co. v. Runyon*, 53 F.3d 1167, 1169 (10th Cir.1995) (quoting *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir.1994)).

Four of these factors are implicated in this case. First, a declaration concerning the enforceability of DCI's patents and CMW's possible infringement might or might not settle the parties' dispute. If infringement were found in this action, the amount of DCI's damages would remain to be determined. At the least, a declaratory action would resolve key issues between the parties and would serve a useful purpose in clarifying their patent relations. Thus the second factor weighs in favor of retaining the case. The fifth factor, the existence of an alternative remedy that is more effective, weighs in favor of dismissal. DCI's later-filed infringement action, if allowed to proceed, would resolve all issues.

The third factor is more difficult to evaluate. The question whether CMW is using the declaratory remedy for procedural posturing or a race to judgment is not easily answered. After carefully considering the facts presented and Federal Circuit patent cases, the Court is persuaded that permitting CMW to pursue a declaratory remedy would not further the purposes of the Declaratory Judgment Act. *See EMC Corp. v. Norand Corp.*, 89 F.3d 807, 814 (Fed.Cir.1996) (it is appropriate for a district court to examine whether hearing the action would serve the legislative objectives of the Act).

When CMW filed suit, it still was trying to initiate licensing negotiations with DCI. In fact, on the day of filing, Mr. Pollman called DCI and asked to speak with Dr. Mercer, the person at DCI authorized to discuss licensing issues. (Pollman Aff. at 3, ¶ 10.) Dr. Mercer returned Mr. Pollman's call the next business day and responded positively to CMW's request to discuss licensing possibilities. (Pollman Aff. at 3, ¶ 12.) For the next three months, the parties moved forward with licensing negotiations, which included personal meetings and written proposals. (Pollman Aff. at 3–4, ¶¶ 10–17.) All the while, CMW was secretly holding its filed but unserved complaint in its pocket, ready for use if negotiations failed. CMW maintains that its silence was necessary to avoid disrupting the negotiation process or appearing to use the litigation as leverage. Silence is one thing; deceit is another.

CMW did not simply keep silent. It instead engaged in a deliberate ruse, pretending that it wanted an amicable resolution of patent issues when in fact it had already filed suit. DCI specifically asked whether CMW was represented by counsel concerning the intellectual property issues under discussion. CMW answered untruthfully, denying that it had retained counsel regarding the patents at issue and representing that it did not want to involve attorneys. (Pollman Aff. at 3–4, ¶ 12; Keyt Decl. at 1–2, ¶ 3.) In fact, its attorneys had already researched the issues,

prepared a complaint, filed the complaint and a disclosure statement, and entered their appearances.

CMW and its litigation counsel are no strangers to this Court; CMW has been a frequent litigant here. It is well-schooled in litigation matters and doubtlessly knew before it filed this action of federal rules favoring the forum of the first-filed action and allowing 120 days to accomplish service of process. While CMW is correct in arguing that there is nothing sinister about delaying service or utilizing the rules to its benefit, the Court finds that CMW did not file suit primarily to obtain a declaration of its legal rights. Rather CMW filed this action on October 11, 2002, for tactical reasons, namely, to gain an advantage in proposed negotiations with DCI. By filing suit first and negotiating afterward, CMW was able to move forward knowing that it already had a convenient forum for litigation if negotiations were unproductive. This is not a situation where a competitor was victimized by a patent owner rattling a sheathed sword, as CMW argues. Rather, here as in *EMC Corp.*, the lawsuit was a tactical measure; CMW saw an advantage in protecting itself first and discussing the issues with DCI later. This posturing is "not a purpose that the Declaratory Judgment Act was designed to serve." *EMC Corp.* 89 F.3d at 815.

In short, the Court finds that CMW was using the declaratory remedy merely for strategic maneuvering. The Court thus concludes that it should decline to hear CMW's declaratory judgment claims and, in the exercise of its discretion, should dismiss the case.

### CONCLUSION

For reasons stated above, Defendant's Motion to Dismiss Plaintiff's Declaratory Judgment Action (Doc. No. 13) is GRANTED. The Court dismisses plaintiff's claims for lack of subject matter jurisdiction and for the additional reason that the Court chooses in its discretion not to hear plaintiff's claim for declaratory relief.